Davidson J. JAMES, Petitioner–Appellant,

v.

Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent–Appellee.

No. 87–3488.

United States Court of Appeals, Eleventh Circuit.

March 30, 1992.

Rehearing and Rehearing En Banc Denied June 2, 1992.

---

Michael A. Mello, Vermont School of Law, South Royalton, Vt., for petitioner-appellant.

William Munsey, Asst. Atty. Gen., Tampa, Fla., for respondent-appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and CLARK, Senior Circuit Judge.

TJOFLAT, Chief Judge:

Davidson Joel James is a Florida prison inmate. He stands convicted of first degree murder, attempted first degree murder, and armed robbery. The trial court sentenced James to death for the murder and to consecutive life sentences for the other crimes. James has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (1988), seeking the vacation of his convictions and sentences. In his habeas petition, James mounted twelve challenges against his convictions and sentences. The district court denied James relief without an evidentiary hearing. Petitioner appeals the district court's disposition of five of his claims, two of which attack his convictions, and three of which attack his sentences only. We find that one of the attacks petitioner levels against his convictions can only be resolved by an evidentiary hearing. Accordingly, we remand the case to the district court for such a hearing. We do not reach, but retain jurisdiction over, petitioner's sentencing claims.

I.

A.

On October 30, 1981, between 5:00 and 5:30 p.m., Felix Satey was about to close the A–1 Decal Printing and Sign Company in Tampa, Florida. Satey and his wife, Dorothy, lived in the back of the building. Before Satey had locked all of the doors, two men entered the building. One of them, Larry Clark, pointed a gun at Satey. When Satey began to move away, Clark shot him once in the head and once in the right shoulder. One of the men took Satey's wallet and eighty dollars from his pocket.

Startled by the shots, Satey's wife called out from the back of the building. Ignoring Satey's pleas to spare his wife, both intruders proceeded to the back of the building. There, Clark shot and killed Mrs.

Satey. In the meantime, Satey had managed to crawl into hiding. After a brief and unsuccessful search for Satey, both men departed, apparently out of concern that someone might have heard the gunshots. Satey then telephoned for an ambulance and called the Tampa Police Department, giving a description of his assailants. While Mrs. Satey later died from her wounds, Satey survived and testified at trial.

In a photo line-up conducted shortly after the incident, Satey identified the gunman as Larry Clark, who had done work for him at A–1 some months prior to the incident. He also identified Clark's accomplice as one Robert Gibbs, a man he had hired several days earlier to repair the roof on the A–1 building and who had started work the day of the incident. According to Satey, Gibbs had left work sometime around 5:00 p.m.

Petitioner James became a suspect on November 10. That day James went to the Tampa Police Department to pick up Clark's car.[1] In the lobby of the police station, R.J. Reynolds, a homicide detective assigned to the Satey case, "got a funny feeling that [James] might be [the] second man" and asked James whether he would mind posing for some photographs because "he does fit the physical description [of Clark's accomplice]...." James acceded to Reynolds' request. According to Detective Reynolds, James was free to leave at any time during his visit to the Tampa police station and understood that these photographs would be shown to witnesses.

After Satey and an employee, Noel Snyder, had identified one of these photographs as a picture of Clark's partner and of the roof worker, respectively, James was arrested and charged with first degree murder, attempted first degree murder, and armed robbery. James and Clark were tried in separate trials. Clark went to trial

first, was found guilty on all counts and was sentenced to death.

At James' trial, the prosecution presented several witnesses to link James to the crime. Satey identified James as Clark's accomplice and as the man he had hired to do roofing work at A–1 the day of the incident. Snyder, Satey's employee, identified James as the roof worker.[2] Finally, a handwriting expert testified that James had filled out the A–1 employment application completed by the man known to Satey as Robert Gibbs.

James raised two compatible defenses: mistaken identity and alibi. During his cross-examination of Satey and in closing argument to the jury, James' counsel brought out that Satey had identified another man as Clark's accomplice in the first photo line-up after the incident and that Satey initially had described Clark's partner as about forty pounds heavier than James. Theresa James, petitioner's mother, testified that he had visited her in Bradenton, Florida, during the late afternoon on the day of the offense. His common-law wife, Frances George, corroborated Ms. James' testimony, adding that James had gone shopping with her between 5:00 and 6:30 p.m. that day after seeing his mother. James' neighbor, Joseph Thomas, testified that James was with him at 3:00 p.m. that day. Finally, another neighbor, Maura Smith, testified that she saw James on Ms. George's porch when she dropped Ms. George off from work between 4:30 and 4:45 that afternoon. She also testified that James and Ms. George went shopping with her later the same evening.

The jury convicted James of first degree murder, attempted murder, and armed robbery.[3] At the conclusion of the sentencing phase, the jury recommended the death sentence by a vote of seven to five. In response to a special interrogatory, the

---

**1.** Following his arrest, Clark had given James a notarized authorization to retrieve his automobile.

**2.** Satey and Snyder also testified to their prior identifications of James from the photo line-ups.

**3.** Although the testimony at James' trial established that only Clark had carried a gun, the judge instructed the jury on both premeditated murder and felony murder. The jury convicted James of first degree murder without identifying the theory or theories underlying its decision.

jury determined by a vote of eleven to one that James had killed, attempted to kill, or intended to kill during the course of the offense. *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Finding no mitigating circumstances and five aggravating circumstances, the trial judge imposed the death penalty.

### B.

On direct appeal, the Florida Supreme Court affirmed James' convictions and sentences. *James v. State,* 453 So.2d 786 (Fla.), *cert. denied,* 469 U.S. 1098, 105 S.Ct. 608, 83 L.Ed.2d 717 (1984). After the Florida governor signed a death warrant, James unsuccessfully sought state postconviction relief. The Florida Supreme Court denied James' petition for a writ of habeas corpus and application for stay of execution in *James v. Wainwright,* 484 So.2d 1235 (Fla.), *cert. denied,* 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986). Two days later, James filed a petition for writ of certiorari and an application for stay of execution in the United States Supreme Court. While that petition was pending, he filed a motion in the state trial court under Fla.R.Crim.P. 3.850 to vacate his convictions and sentences. The state trial court denied relief and the Florida Supreme Court affirmed.

At this point, James entered the federal system by filing the instant petition for writ of habeas corpus in the United States District Court for the Middle District of Florida. On the same day, both the district court and the United States Supreme Court granted stays of execution. On June 12, 1986, the Florida Supreme Court issued an order explaining its decision in petitioner's Rule 3.850 proceedings. *James v. State,* 489 So.2d 737 (Fla.1986). The Supreme Court dissolved its stay of execution when it denied certiorari on June 23, 1986.

*James v. Wainwright,* 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986).

James' federal habeas petition presented twelve claims for relief. On appeal, petitioner raises five claims. Two claims challenge petitioner's convictions: (1) petitioner was incompetent to stand trial and (2) the prosecution withheld evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The remaining three claims attack petitioner's sentences: (1) a prior conviction considered as an aggravating circumstance at sentencing was invalid, (2) petitioner's counsel rendered ineffective assistance at sentencing, and (3) a psychologist appointed to examine petitioner provided ineffective assistance in the preparation for the sentencing phase.

After the State filed its response to James' federal habeas petition, the district court denied petitioner relief without an evidentiary hearing on the ground that the records of the criminal and collateral proceedings in the state courts conclusively established that petitioner's claims lacked merit. Although we agree with the district court that petitioner's *Brady* claim is without merit, we find that an evidentiary hearing is necessary to resolve petitioner's incompetency claim. If petitioner is entitled to relief on his incompetency claim, we need not, and do not now, reach the challenges he mounts against his sentences.

Part II of our opinion disposes of petitioner's *Brady* claim. Part III addresses petitioner's incompetency claim.

### II.

■■■ Petitioner argues that the prosecution's refusal to disclose the identity and criminal record of the man Satey identified as Robert Gibbs in the first photo line-up constituted a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[4] Petitioner is not entitled to an

---

4. Petitioner raises two other *Brady* claims, both meritless. First, he complains of the prosecution's failure to provide him with a tape recording of Satey's emergency call to the police. The prosecutor repeatedly and consistently confessed his inability to locate the tape. Petitioner offers nothing to challenge this explanation. We see no reason to question the prosecutor's

explanation, particularly because destruction of the tape by the police would have been in accordance with standard procedures. Assuming *arguendo* that the tape had been destroyed—a fact never established during the proceedings in trial court—the police were under no obligation to preserve the tape. Satey's description of his assailants during this telephone call at most

evidentiary hearing on this claim because he failed to preserve it for appeal.

Recovering in the intensive care unit during the early hours of the morning following the October 30 incident, Satey, without his glasses, identified two men in a photo line-up: Larry Clark and "the guy that calls himself Robert." The line-up did not include a picture of petitioner. Later that same morning, Satey again picked Clark's picture out of another photo line-up, which also did not include petitioner's photograph. Finally, in a third photo line-up on November 10, Satey identified one of the pictures taken of petitioner at the Tampa Police Department earlier the same day as a picture of "the guy that was with the man with the gun."

Satey's initial identification of Clark's accomplice triggered a series of pre-trial discovery attempts. On February 16, 1982, about five months prior to trial, petitioner moved for disclosure of the following information regarding the man Satey first identified as "Robert" (the "Robert" information): name, last known address, criminal record, and any information linking this man to Clark or the case against James. The judge granted the motion and, at a hearing on March 12 of the same year, the prosecutor agreed to produce the requested information. At another hearing three months later, on June 11, petitioner requested the trial judge to compel the prosecution to release the "Robert" information. The judge granted this motion as well, and the prosecutor once again agreed to comply with petitioner's request. Finally, on July 6, one week before trial, petitioner moved

for sanctions based upon the prosecution's failure to release the "Robert" information and a tape recording containing potentially exculpatory evidence.[5] Following the prosecutor's explanation for not having provided petitioner with the requested tape recording, the trial judge denied the motion. At this point, the prosecutor volunteered the following justification for not having produced the "Robert" information: "I had all the detectives in the Homicide Division look at that photograph to see if they could identify the individual. They said it was a juvenile, and his records were sealed, and there was no way any of them knew who it was." To this statement, the judge responded "All right."

Neither at this point, nor at any other time during the hearings on any of petitioner's motions requesting disclosure of the "Robert" information, did petitioner challenge the prosecutor's explanation for failing to produce the requested information or claim that the prosecutor had failed to make a reasonable effort to obtain that information. Petitioner did not express dissatisfaction with the prosecutor's response to his motion for sanctions until his brief to the Florida Supreme Court on direct appeal.

According to Florida law, the confidential records of a juvenile may only be unsealed pursuant to a court order. At any time after the prosecutor's explanation, petitioner could have requested a court order requiring disclosure of the juvenile's records pursuant to Fla.Stat. § 39.12 (1981). As the Florida Supreme Court pointed out in its opinion on direct appeal, petitioner nev-

constituted potentially exculpatory evidence. Destruction of potentially exculpatory evidence violates *Brady* only if the police acted in bad faith. *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (absent a showing of bad faith, failure of police to freeze clothing of sexual assault victim to allow for later defense testing did not violate due process); *California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984) (failure to preserve breath sample of suspected drunk driver did not violate due process). As petitioner does not allege, and we cannot find, bad faith on the part of either the prosecution or the police, no *Brady* violation exists.

Petitioner also challenges the prosecution's failure to disclose that a jacket introduced into evidence as the jacket Robert Gibbs wore while repairing the roof at A–1 displayed certain characteristics purported to be inconsistent with Snyder's identification of James as the roof worker. We find no merit in this argument because the record fails to reveal the alleged inconsistency, and even if it did, defense counsel had access to the jacket and was therefore in as good a position as the prosecutor to detect any inconsistencies. *Brady* obviously does not impose a duty on the prosecution to try the case for the defense.

5. *See supra* n. 4.

er sought such a court order. *James v. State*, 453 So.2d 786, 790 (Fla.), *cert. denied*, 469 U.S. 1098, 105 S.Ct. 608, 83 L.Ed.2d 717 (1984).[6]

Petitioner thus failed to seize multiple opportunities to obtain a court order for the "Robert" information or to challenge the prosecution's efforts to obtain this information. Accordingly, we hold that he is now barred from complaining of the prosecution's refusal to turn over the "Robert" information.

### III.

### A.

On appeal, petitioner raises a procedural and a substantive claim of incompetency to stand trial. First, petitioner argues that the state trial court violated his procedural due process rights under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), by failing to conduct a competency hearing on its own initiative. Second, he contends that his substantive due process rights were violated because he was tried while incompetent, regardless of whether or not the state trial court committed error in failing sua sponte to conduct a competency hearing. We hold that petitioner is entitled to an evidentiary hearing on his second, substantive, incompetency claim only.

This case amply illustrates the urgent need for clearly distinguishing between the two incompetency claims available to a federal habeas petitioner. Competency to stand trial did not become an issue in this case until petitioner raised a substantive incompetency claim in his motion for state post-conviction relief under Fla.R.Crim.P. 3.850. As we explain below, the Florida Supreme Court applied an incorrect legal standard in dismissing this claim. In the federal district court, petitioner again raised only a substantive claim of incompetency. Responding to the petition, the State, however, mistook this substantive incompetency claim for a *Pate* claim and pled procedural default.[7] Apparently led astray by the State's error, the district court rejected the *Pate* claim petitioner had never raised without ever addressing petitioner's substantive incompetency allegations.[8] In this court, perhaps precipitated by the district court's misinterpretation of petitioner's substantive incompetency claim, a *Pate* argument finally found its way into petitioner's appellate brief, uneasily intermingled with the substantive incompetency claim the district court never considered.

In light of the havoc petitioner's incompetency claims wreaked in state and federal court, we find ourselves compelled to distinguish *Pate* claims and substantive claims of incompetency before turning to the details of petitioner's case.

Our discussion naturally commences with a look at the Supreme Court's opinion in *Pate v. Robinson*. By the time the Court decided *Pate*, the substantive claim of incompetency at trial had been firmly established. *See Pate*, 383 U.S. at 388 n. 1, 86 S.Ct. at 843 n. 1 (Harlan, J., dissenting); *Nathaniel v. Estelle*, 493 F.2d 794, 796–97 (5th Cir.1974).[9] This incompetency claim invokes the Due Process Clause of the Fourteenth Amendment, which for some time has been interpreted as prohibiting states from trying and convicting a mentally incompetent defendant. *See Dusky v.*

---

6. Petitioner not only failed to request a court order to release the "Robert" information, he arguably also failed to obtain a ruling from the trial judge on his motion for sanctions on the ground that the prosecution had failed to turn over the "Robert" information. As mentioned above, the trial judge ruled only on the alternate ground for petitioner's motion for sanctions. The judge's response of "All right." to the prosecutor's representations at the very least should have prompted petitioner's request for an explicit ruling on the "Robert" information issue.

7. According to the State, petitioner defaulted on the *Pate* claim by not raising it on direct appeal from his convictions.

8. The district court later denied petitioner's motion to alter or amend judgment, which, *inter alia*, complained of this misinterpretation.

9. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *Pate,* 383 U.S. at 384–86, 86 S.Ct. at 841–42, 15 L.Ed.2d 815; *Fallada v. Dugger,* 819 F.2d 1564, 1568 (11th Cir.1987).

In *Pate,* the Supreme Court ordered the district court to issue the writ of habeas corpus because (1) the state trial judge had denied defendant Robinson due process of law by failing sua sponte to conduct a competency hearing [10] in the face of information raising a bona fide doubt regarding Robinson's competency to stand trial, and (2) the passage of six years barred the state from establishing the harmlessness of the trial court's error by proving in a *nunc pro tunc* hearing that Robinson had been competent to stand trial.

Robinson sought the writ following the Illinois Supreme Court's rejection of his allegation on direct appeal that the trial judge had committed error by failing to hold a competency hearing. *People v. Robinson,* 22 Ill.2d 162, 174 N.E.2d 820, 823 (Ill.1961), *cert. denied,* 368 U.S. 857, 82 S.Ct. 97, 7 L.Ed.2d 55 (1962). Significantly, Robinson did not raise, and the Supreme Court did not consider, a substantive claim of actual incompetency. Looking solely to the facts available to the trial judge, the Court ordered the district court to issue the writ without having considered other evidence of actual incompetency. *See Pate,* 383 U.S. at 378–85, 86 S.Ct. at 838–42.

The Supreme Court declined to allow the state to cure the established due process defect by conducting a *nunc pro tunc* competency hearing in state court, which in Illinois would have been held before a jury. *Pate,* 383 U.S. at 387, 86 S.Ct. at 843. In rejecting this remedy, the Supreme Court pointed to the difficulties of retrospectively determining competency at the time of trial, including the passage of time (six years in Robinson's case) and the new jury's obvious inability to observe the defendant at the time of trial. *Id.*

*Pate* therefore put another spin on the already well-established prohibition against trying and convicting an incompetent defendant. *Pate,* in essence, established a rebuttable presumption of incompetency upon a showing by a habeas petitioner that the state trial court failed to hold a competency hearing on its own initiative despite information raising a bona fide doubt as to the petitioner's competency. According to *Pate,* the state could rebut this presumption by proving that the petitioner in fact had been competent at the time of trial.[11]

In short, *Pate* turned the tables on the state as soon as the habeas petitioner established the relevant trial error. Whereas the petitioner in a traditional, substantive, claim of incompetency was forced to establish his incompetency, it was now on the state to prove competency.[12] Specifically,

**10.** Apparently, Robinson had not requested a competency hearing before a jury on a special plea of insanity, as provided by Illinois law. *Pate,* 383 U.S. at 384, 86 S.Ct. at 841; *People v. Robinson,* 22 Ill.2d 162, 174 N.E.2d 820, 823 (1961), *cert. denied,* 368 U.S. 857, 82 S.Ct. 97, 7 L.Ed.2d 55 (1962).

**11.** On its face, *Pate* appears to hold that the trial court's failure sua sponte to hold a competency hearing raised a conclusive, rather than a rebuttable, presumption of incompetency. *See Pate,* 383 U.S. at 386, 86 S.Ct. at 842 ("Having determined that Robinson's constitutional rights were abridged by his failure to receive an adequate hearing on his competence to stand trial, we direct that the writ of habeas corpus must issue and Robinson be discharged, unless the State gives him a new trial within a reasonable time."). Although *Pate* remains less than unequivocal on this point, two factors strongly suggest that the Court established a rebuttable presumption upon a showing of trial court er-

ror. First, an alternative formulation of the holding compels this conclusion. *See Pate,* 383 U.S. at 377, 86 S.Ct. at 838 ("We have concluded that Robinson was constitutionally entitled to a hearing on the issue of his competence to stand trial. Since we do not think there could be a meaningful hearing on that issue at this late date, we direct the District Court [to issue the writ]."). Second, the Court's consideration of ways in which the state might rectify the trial court's error by means of a *nunc pro tunc* competency hearing can only be interpreted as a harmless error analysis. While the Court held that, given the facts in *Pate,* the state could not establish harmless error, it did not hold that *Pate* error could never be harmless.

**12.** Although our precedent sheds little light on the question, it apparently also places the burden of proof in these *nunc pro tunc* competency hearings on the state. *Cf. Zapata v. Estelle,* 588 F.2d 1017, 1020–22 (5th Cir.1979) (writ must issue upon demonstration of *Pate* violation, i.e.,

it was now on the state to take the significant threshold hurdle of demonstrating that the petitioner's competency at the time of trial could be determined *ex post facto*, often years after the trial had occurred. *See Zapata v. Estelle,* 588 F.2d 1017, 1020–22 (5th Cir.1979).

■ A *Pate* claim of incompetency, therefore, differs from a substantive incompetency claim in the following respects. A petitioner presenting a claim under *Pate* must first establish that the trial court should sua sponte have held a competency hearing.[13] Once the petitioner has established this, he or she has made out a federal constitutional violation. At this point, the state has the opportunity to establish before the federal district court the petitioner's competency at the time of trial. In effect, the state thereby may demonstrate that the state trial court's failure to hold a competency hearing constituted harmless error. In this harmless error inquiry, the federal district court need not decide whether or not the error influenced the determination of guilt or punishment, be-

cause a finding of incompetency by the state trial court would have precluded a determination of guilt or innocence: the defendant could not have been tried. In other words, the trial of an incompetent defendant is per se prejudicial.[14]

■ By contrast, a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.

■ In sum, there are two kinds of incompetency claims. First, a petitioner may allege that the trial court denied him or her due process by failing sua sponte to hold a competency hearing. This is a *Pate* claim. Second, a petitioner may allege that he or she was denied due process by being tried and convicted while incompetent. This is a substantive claim of incompetency. To put it bluntly, a *Pate* claim is a substantive incompetency claim with a presumption of incompetency and a resulting reversal of proof burdens on the competen-

---

the state loses, if no meaningful competency hearing is possible).

13. In passing on this issue, the court may, of course, only consider the information before the state judge at trial. *Tiller v. Esposito,* 911 F.2d 575, 576 (11th Cir.1990); *Demos v. Johnson,* 835 F.2d 840, 843 (11th Cir.), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988); *Hance v. Zant,* 696 F.2d 940, 948 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983).

14. The Supreme Court in *Pate* only discussed the option of a competency hearing in state court. Two considerations, however, strongly favor a *nunc pro tunc* hearing in federal court. First, the question whether a federal constitutional violation constituted harmless error clearly is a question of federal law. As noted above, however, the *nunc pro tunc* hearing is nothing but a harmless error determination in disguise. Second, a state court competency hearing out of the context of a state criminal trial would make for a virtually unappealable proceeding caught in the never-never land between criminal and civil procedure. While the state trial court's competency determination may be appealable in the state appellate courts under some more or less tortured interpretation of that state's final judgment rule, it would face a long and winding road back into the federal court system, past creative readings of the feder-

al habeas statute and beyond the ordinary limits of federal jurisdiction. First, an appeal from a competency determination would run smack into the federal habeas statute, which authorizes a federal habeas court to review a "judgment," 28 U.S.C. § 2254(a) (1988), not an ancillary proceeding neither civil nor criminal in nature, conducted by a state court upon the urging of a state prosecutor attempting to fulfill the condition a federal court has placed upon that state's authority under the Federal Constitution to incarcerate a particular individual. In an attempt to finagle the "judgment" problem, the federal court sending the case back to state court could vacate the conviction and direct that it be reinstated upon a finding of competency. Upon exhaustion of state remedies with respect to the competency finding, the federal habeas court would now review a "judgment." Assuming a fair hearing in state court, the petitioner, however, would still struggle to make out a federal constitutional claim: a simple finding of competency arguably does not constitute a federal constitutional violation. Unlike a traditional substantive claim of incompetency, which alleges the due process violation of trying and convicting an incompetent defendant, a petition complaining of a state court's finding of competency in a *nunc pro tunc* hearing could allege no such due process violation. Without a federal constitutional claim, however, the federal habeas court would lack jurisdiction to entertain the petition.

cy issue.[15]

### B.

On appeal from a trial court's failure sua sponte to hold a competency hearing, an appellate court may consider only the information before the trial court before and during trial. *See Tiller v. Esposito*, 911 F.2d 575, 576 (11th Cir.1990); *Demos v. Johnson*, 835 F.2d 840, 843 (11th Cir.), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988); *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir.1987) (citing *Hance v. Zant*, 696 F.2d 940, 948 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983)). Accordingly, *Pate* claims can and must be raised on direct appeal. As pointed out above, petitioner did not present a *Pate* claim on direct appeal. Even if petitioner had exhausted state remedies by raising a *Pate* claim on direct appeal, we could not consider his current *Pate* claim because his federal habeas petition included no such claim.

### C.

While petitioner failed to present a *Pate* claim to the federal district court, he did allege that he was denied due process because he was tried while incompetent. As discussed above, this substantive incompetency claim does not require a showing of error on the part of the trial judge, or any other state actor. According to binding precedent in our circuit, a petitioner is entitled to a hearing on his or her substantive incompetency claim upon a presentation of "clear and convincing evidence [raising] a substantial doubt" as to his or her competency to stand trial. *Fallada*, 819 F.2d at 1568 n. 1 (quoting *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir. 1985)). We hold that petitioner has alleged

sufficient facts to require a hearing on his substantive incompetency claim.

Before explaining why petitioner's allegations entitle him to a competency hearing, we pause to explore the absence of alleged state misconduct in claims alleging the trial of an incompetent in violation of the Due Process Clause of the Fourteenth Amendment. We indulge in this brief digression not to question the applicability of precedent but to shed light on a critical element of substantive incompetency claims.

In order to make out his substantive incompetency claim, petitioner need not, and does not, allege any error on the part of any state actor. For example, petitioner does not complain of the trial judge's failure (1) to appoint an expert to assess petitioner's competency to stand trial, (2) to conduct a competency hearing, either sua sponte or upon request, or (3) to declare him incompetent as a result of a competency hearing. Similarly, petitioner does not complain of defense counsel's performance. Nowhere does petitioner assert that defense counsel failed (1) to request an expert for the purpose of assessing petitioner's competency, (2) to request a competency hearing or otherwise to alert the trial court to the petitioner's potential incompetency, (3) to notice indications of petitioner's incompetency, or (4) to investigate indications of petitioner's incompetency.

This absence of any allegation of error committed by a state actor differentiates substantive incompetency claims from other challenges deriving from a defendant's alleged incompetency, including *Pate* claims and Sixth Amendment claims of ineffective assistance of counsel.

The Fourteenth Amendment prohibits states from denying defendants due process of law by trying them while incom-

---

**15.** Our circuit further distinguishes between *Pate* claims and substantive incompetency claims by differentiating between the threshold a petitioner must pass to prevail under either claim. Under a *Pate* claim, a petitioner must establish that the state trial judge ignored facts raising a "bona fide doubt" regarding the petitioner's competency to stand trial. *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir.1987). To

receive a competency hearing pursuant to a claim of actual incompetency, a petitioner must "present[ ] clear and convincing evidence [raising] a 'real, substantial and legitimate doubt'" as to his or her competency. *Fallada*, 819 F.2d at 1568 n. 1 (quoting *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir.1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986)).

petent. Unlike other amendments, including the First and Sixth Amendments, the Due Process Clauses of the Fifth and Fourteenth Amendments do not establish an affirmative right. Instead, they prohibit the states from engaging in certain activities, namely depriving persons of their life, liberty, or property, in a certain manner, namely without due process of law.

■ It has long been established that the conviction of an incompetent defendant denies him or her the due process of law guaranteed in the Fourteenth Amendment.[16] *See Pate*, 383 U.S. at 378, 86 S.Ct. at 838 (citing *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956) (per curiam opinion summarily vacating the judgment and remanding to the district court for a competency hearing)). A defendant's allegation that he or she was tried and convicted while incompetent therefore claims that the state, by trying him or her for and convicting him or her of a criminal offense, has engaged in certain conduct covered by the Fourteenth Amendment, namely deprivation of life, liberty, or property, in a way prohibited by the Fourteenth Amendment, namely without due process of law. Accordingly, in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the United States Supreme Court recognized that "a state criminal trial, a proceeding initiated and conducted by the State, is an action of the State within the meaning of the Fourteenth Amendment." *Id.* at 343, 100 S.Ct. at 1715.

■ A substantive incompetency claim implicates the Fourteenth Amendment's prohibition against deprivations of life, liberty, or property without due process of law by identifying a specific deprivation. While such a claim assigns responsibility for the deprivation to the state, it need not assign responsibility for the absence of due process to the state as well. To try an incompetent defendant makes for an undue process regardless whether or not any person, state actor or not, could or should have diagnosed the defendant's incompetency. This absence of due process blossoms into a constitutional violation if it occurred during a proceeding in which the state deprived a person of life, liberty, or property. In short, a substantive incompetency claim based on the Due Process Clause of the Fourteenth Amendment requires an allegation of state action, not of state misconduct.

We now return to the case at hand. According to precedent in our circuit, a petitioner is entitled to an evidentiary hearing on a substantive incompetency claim if he or she "presents clear and convincing evidence to create a 'real, substantial and legitimate doubt'" as to his or her competency.[17] *Fallada*, 819 F.2d at 1568 n. 1

---

16. Our discussion of state action focuses on the Due Process Clause of the Fourteenth Amendment as the conduit between the Bill of Rights and the states.

17. We interpret this language as referring to the proffer of proof a petitioner must make, rather than to the burden of proof a petitioner must meet, to receive an evidentiary hearing. It is well established that a habeas petitioner is entitled to an evidentiary hearing on a claim if he or she alleges facts that, if proved at the hearing, would entitle the petitioner to relief. *See Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963); *Thomas v. Zant*, 697 F.2d 977, 983 (11th Cir.1983). In our interpretation, the standard adopted in this circuit for determining whether or not a petitioner is entitled to a hearing on a substantive incompetency claim merely attempts to adapt this general principle to the specific case of a substantive incompetency claim. The requirement of "clear and convincing" evidence raising a "substantial doubt" seeks to distinguish substantive incompe-

tency claims from *Pate* claims, which as mentioned above, only require a showing of "bona fide doubt" as to competency at trial. Considering that we have exposed this distinction between *Pate* claims and substantive incompetency claims as misleading, we would do away with this circuit's requirement of "clear and convincing" evidence raising a "substantial doubt" as to competency. Precedent, however, restricts us to pointing out that a determination whether or not a petitioner has presented "clear and convincing" evidence in his or her habeas petition would appear to require credibility assessments without the benefit of live testimony and would jar with the principle that, for the purposes of deciding on the necessity of an evidentiary hearing, the petitioner's allegations must be accepted as true. Moreover, the requirement that the petitioner need only raise a "substantial doubt" as to his or her competency would seem to suggest that a petitioner would be entitled to a competency hearing without having to allege incompetency.

(quoting *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir.1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986)). A defendant is considered competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and [if] he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

■■■ As mentioned above, the district judge failed to address petitioner's substantive incompetency claim because he misinterpreted it as a *Pate* claim. We now proceed to examine the allegations petitioner makes in his habeas petition to determine whether or not petitioner is entitled to an evidentiary hearing on his substantive incompetency claim.

■■■ Petitioner raised an identical substantive incompetency claim in his 3.850 motion in state trial court. That court rejected his claim and the Florida Supreme Court affirmed. Their findings of fact, as well as those made by the court at the time of trial, are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Fallada*, 819 F.2d at 1569 n. 3 (citing *Price v. Wainwright*, 759 F.2d 1549, 1552 (11th Cir.1985)). We do not, however, feel constrained by the disposition of petitioner's substantive incompetency claim in state court. First, no state court, from the judge who presided over the proceedings in the trial court to the Florida Supreme Court in its opinion affirming the denial of petitioner's 3.850 motion, has ever made findings of historical facts underlying a determination of competency. Indeed, no state court has found petitioner to have been competent to stand trial.[18] Petitioner's substantive incompetency claim in his 3.850 motion

was rejected without a hearing on the basis that it failed to allege facts sufficient to warrant relief.

We find two faults with the Florida Supreme Court's disposition of petitioner's substantive incompetency claim. First, the court misrepresented petitioner's allegations. Its opinion affirming the trial court's denial of petitioner's 3.850 motion noted that the report by Dr. Harry Krop, which petitioner's 3.850 motion and federal habeas petition quote extensively, "falls short of stating that [petitioner] was incompetent to stand trial." *James v. State*, 489 So.2d 737, 739 (Fla.1986). On the contrary, Dr. Krop's report, as quoted in petitioner's 3.850 motion and in his federal habeas petition, specifically concludes that

> [a]pplying the clinical features of [petitioner's] Organic Personality Syndrome to those factors the courts request us to utilize in determining competency to stand trial, and behavioral features of Mr. James' characterological makeup, [petitioner] *would have definitely been found lacking* in the following categories at the time of trial:
> 1). His capacity to disclose to his attorney pertinent facts surrounding the alleged offense....
> 2). Mr. James' ability to relate to his attorneys....
> 3). Likewise, his ability to assist his attorney in planning a defense....
> 4). Mr. James' capacity to realistically challenge the prosecution witnesses....
> 5). Similarly, his ability to testify relevantly....[19]

(Emphasis supplied.) In addition to incorporating Dr. Krop's conclusions, petitioner's 3.850 motion and federal habeas petition explicitly allege that "he was tried while incompetent" and that his "organic

---

**18.** As competency to stand trial constitutes a mixed question of law and fact, this finding would, of course, not have been entitled to a presumption of correctness.

**19.** Admittedly, Dr. Krop's report is not a model of clarity. In addition to the confident conclusions quoted above, the report contains far more cautious assessments of petitioner's com-

petency: "it [is] probable that [petitioner's] ability to assist his attorney at the time of trial was seriously impaired by his organic disorder"; "it is probable that [petitioner's] paranoia could have impaired his ability to assist the attorney who represented him"; "it is probable Mr. James was unable to assist in his defense as a result of his Organic Personality Syndrome."

mental condition rendered him unable to assist in his defense." Considering these repeated allegations of actual incompetency, we must disagree with the Florida Supreme Court's conclusion that petitioner merely has alleged probable, rather than actual, incompetency.

 Moreover, the Florida Supreme Court applied an incorrect legal standard in affirming the trial court's rejection of petitioner's actual incompetency claim without an evidentiary hearing. The court apparently treated the State's response to petitioner's 3.850 motion as a motion for summary judgment based on observations contained in the pre-trial psychological report by Dr. Gerald Mussenden. The court weighed this initial report against Dr. Krop's report and concluded that the latter was "insufficient to contradict substantially the original psychiatric study and, even if [it] did, [was] insufficient to raise the issue of incompetence to stand trial." *James v. State*, 489 So.2d at 739.

Instead of dismissing petitioner's substantive incompetency claim for failing substantially to contradict observations contained in a psychological report, the court should have determined whether petitioner had alleged sufficient facts to warrant a competency hearing. Rather than accept Dr. Mussenden's observations as true unless substantially contradicted, the court should have taken petitioner's allegations as true. Petitioner would have been, and still would be, entitled to a competency hearing if his allegations, taken as true, would entitle him to relief.

We now conduct an independent review of petitioner's allegations of actual incompetency. Based on the allegations of actual incompetency quoted above, we hold that petitioner has presented clear and convincing evidence raising a substantial doubt as to his competency to stand trial.

Accordingly, we REVERSE the district court's denial of habeas corpus relief on petitioner's substantive incompetency claim. We REMAND the case to the district court to conduct an evidentiary hearing on that claim, and, thereafter, to certify its findings of fact and conclusions of law to us.

IT IS SO ORDERED.