[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13731
Non-Argument Calendar
_____

D.C. Docket No. 4:10-cv-00255-RH-CAS

WILLIAM CARMAN,

Petitioner-Appellant,

versus

DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 4, 2015)

Before HULL, WILLIAM PRYOR and JULIE CARNES, Circuit Judges.

PER CURIAM:

William Carman, a Florida prisoner, appeals the denial of his petition for a writ of habeas corpus. 28 U.S.C. § 2254. Carman argues that a state trial court violated his right to due process as guaranteed in the Fourteenth Amendment by failing *sua sponte* to conduct a hearing to determine whether he was competent to stand trial. *See Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836 (1966). The district court ruled that it was not contrary to or an unreasonable application of clearly established federal law for a Florida appellate court to reject Carman's argument. We affirm.

## I. BACKGROUND

We divide the background of this appeal in three parts. First, we discuss Carman's trial and post-trial proceedings. Second, we discuss Carman's direct appeal. Third, we discuss Carman's federal petition for a writ of habeas corpus.

### A. *Carman's Conviction and the Denial of his Motion for a New Trial*

In 2005, Carman was charged in a Florida court for abusing two minors. Carman's second amended information alleged that he had sexually battered S.M., a child under the age of 12, Fla. Stat. § 794.011(2)(a), and had twice touched G.C., a child under the age of 12, in a lewd or lascivious manner, *id.* § 800.04(5)(b). Carman moved to sever the charges.

On the first day of trial, August 18, 2005, defense counsel announced that he was abandoning the motion to sever, and the trial court questioned Carman about

2

the matter. The trial court asked Carman if he thought that it was in his best interest to dismiss the motion, and Carman responded affirmatively. The trial court also asked Carman if he had been coerced or enticed to dismiss the motion, and Carman responded negatively to both inquiries. Finally, the trial court asked Carman if he was satisfied with his trial attorney's advice and Carman responded, "Yes, sir."

Defense counsel reported that Carman had "taken some prescription medication" and that it might affect his ability to "assist . . . properly in his defense." Defense counsel stated that Carman's family had complained that morning that Carman was "seeing double and could not wake up and [was] not acting himself." Counsel also said that he had talked to Carman, he was acting differently, and he had "taken some prescription [nerve] medication" that counsel had "asked . . . [Carman] at some point in the past to wean himself off of." According to counsel, Carman had taken "one [pill] after midnight" to help him sleep. The trial court remarked that Carman "seems to be okay . . . just looking at him" and based on "the questions . . . [being] asked . . . ." But defense counsel countered that he "had to hold [Carman] up in the street . . . [to] talk[] to him" and that his "investigator, who . . . knows [Carman], has noticed that his heart is racing, although he looks fairly composed on the outside." Counsel insisted that Carman was not "responding . . . the way [he] f[elt] like [Carman] should be."

3

The trial court questioned Carman to ensure that he understood what had transpired so far. The trial court asked Carman "how [he] [was] feeling today," and Carman responded, "I'm kind of groggy, a little bit groggy." In response to being asked if he could "hear all right," Carman stated, "Yes, I can hear." And Carman responded affirmatively to being asked if he comprehended "[t]he questions [that he was] just asked . . . about the severance motion." When asked if he understood "that [he] [had] the right to theoretically have two trials; . . . one on the one alleged victim and one on the other alleged victim," Carman replied, "Right." Carman acknowledged that he had talked to his attorney about the motion to sever, and then Carman explained that "we want to do them together." The trial court remarked that "the same evidence would come in probably on both the trials, or could come in on both trials anyway if you had two," to which Carman responded, "Right."

Carman confirmed that he had ingested a prescription medicine during the previous evening. The trial court asked if Carman had "taken any medication today," and Carman responded, "Today, no. Not this morning. This was earlier." And when asked if he had taken anything "since [he] woke up this morning," Carman answered, "Not since I woke up, no." Carman said that he had ingested the medicine "about midnight," and that it worked "like an antidepressant. It helps you sleep." Carman said that he was "not sure" of the name of the medication or its

4

dosage, but he knew that "it [was] small pills, about that size" that had been prescribed by "Dr. Whiddon."

Carman stated that he took the medicine occasionally and that it did not affect his cognitive abilities. When asked if he had been "taking [the medicine] for awhile now," Carman responded, "Just off and on when there's anxiety. I don't take them all the time." The trial court asked if Carman had "take[n] them the other day for jury selection," and he said, "Actually, I didn't take them before then, no." Carman acknowledged that, "if [he] [got] anxious or nervous or something, [he] t[ook] them and they tend[ed] to calm [him] down" and that the medicine "[n]ormally" did not affect his reasoning. When asked if he could complete a crossword puzzle, Carman answered, "It might take me a little longer, but I can do it." And Carman affirmed that he was "able to assist [his attorney]," who Carman acknowledged would need his "input on certain things with witnesses and what they say or . . . what they might not say." The trial court asked Carman if he had "any more of the medicine with [him]," and Carman responded, "No," and then he interrupted the trial court to say, "In fact, I don't have any more at all now." When asked if he "took the last one last night," Carman replied, "This is over with."

The trial court assured Carman that he could request a recess, if one was needed. The trial court asked for an "assur[ance] . . . [from Carman] that if [he] need[ed] a break, [he] [could] tell [his attorney] and [the court would] take a

5

break," and Carman replied, "Okay." The trial court also instructed Carman that "if things start going too fast, [he could] stop and . . . tell [his attorney] and [the court would] take a break," and Carman responded, "Yes, sir." Carman also responded affirmatively when he was told that he "need[ed] to know what's going on here today and . . . need[ed] to be able to help" his attorney because a trial "is kind of a team thing." And Carman agreed "that if [he] g[ot] confused or something that [he'd] stop and tell [his attorney], and [the trial court] would take a recess . . . [or] take a break if that's necessary."

After a brief conference with Carman, defense counsel moved for a continuance on the ground that Carman "c[ould] [not] assist . . . today." The prosecutor responded that Carman "m[ight] be a little wobbly on his pins," but that a continuance was unnecessary in the light of the "inquir[ies]" made and Carman's "ab[ility] to understand all the questions that the Court gave[ and to] make intelligent, rational responses."

The trial court denied Carman's motion, but it reminded Carman that he could request a recess at any time. The trial court explained that it "had a fairly extensive colloquy with Mr. Carman, and [was] convinced that he understands what's going on" despite his consumption of "some medication last night that's prescription medication that he takes for nerves and so forth." The trial court acknowledged that it "would feel the same way . . . if [it] was sitting in [Carman's]

6

chair," but that it "th[ought] [Carman] [was] competent to go forward today." The trial court assured Carman that "if things are starting to go too fast for him, or he is confused as to what's going on, that he needs to tell [his attorney], . . . [who] can ask . . . [for] a recess to make sure that he's able to assist his lawyer." And Carman responded affirmatively to a reminder that he had "promised . . . that if things go out of hand, as far as [his] ability to keep up with things, [he] would tell [his] lawyer to stop the trial . . . ." The trial court was confident that Carman would "be all right" because "as the day [went] on, and this medication that [he] took last night . . . w[ore] off, [he] w[ould] probably feel better and better." Carman would be capable of assisting his attorney, the trial court opined, because "the first witness is probably not going to be called for about an hour. And that . . . w[ould] assist [him] in getting [his] sea legs under [him] . . . ."

Carman "ma[de] gestures to the jury in reaction to things" that were said by the prosecutor during the opening statements. During a recess, the prosecutor asked the trial court to "admonish[]" Carman for "trying to communicate with the jury by nodding [his] head[] and making gestures." The trial court remarked that it was "counter productive for anybody to do that" and agreed to "admonish everyone not to do that."

On August 19, 2005, the jury returned its verdicts. The jury found Carman guilty of the sexual battery of S.M. and of two counts of battering G.C., as lesser-

included offenses of the two charges of touching G.C. in a lewd and lascivious manner.

On August 29, 2005, Carman moved for a new trial. Carman argued that he had been entitled to a continuance because "he was incapable of assisting his own counsel in his defense at all stages of his trial on August 18–19, 2005." Carman alleged that, in addition to the evidence in the trial transcript about his mental state, he had been "pale, nearly ashen in complexion" when his trial commenced; he had been "unsteady on his feet and used walls, chairs, and counsel table for balance"; he had "said nothing to counsel and wrote no notes to counsel" when the first victim and a second prosecution witness testified; he had "continued to appear ashen and disoriented" throughout the morning; he "beg[a]n to write notes and communicate with counsel" after the second victim testified; his counsel had realized that his condition had been "much more apparent and serious [after] [being] provided with an apparent suicide letter that was found in [Carman's] room after the trial"; and he had "ingested far more Lorazepam than he disclosed to the Court."

The trial court held a hearing on Carman's motion. Carman testified that he consumed between four and eight pills of Lorazepam in an attempt to commit suicide. Carman also presented testimony from Dr. Darren Rothschild, a forensic psychiatrist, that Carman had to have been intoxicated on the morning of trial

because his previous ingestion of only one pill had "knocked [him] out" and that, "due to [his] intoxication[,] . . . he was not competent to stand trial[] because he was unable to adequately assist in his defense." The doctor opined that, in the morning, Carman would have been "confus[ed]" and "sedat[ed]," had "difficulty processing information," and had a "memory [that was] impaired," and "by the afternoon, he [w]ould have been coming to a little bit and [could] . . . pay attention." Dr. Rothschild testified that Carman "would have been . . .[un]abl[e] to pay attention" and that his statements before trial were not credible because, "while intoxicated, people can say all types of things" and are "[un]ihibit[ed]" and, "if asked superficial questions, . . . [are] likely to comply yes or no and may . . . respond[] to part of the question . . . not understanding [its] full magnitude . . . ."

The trial court questioned defense counsel, who acknowledged that he had not requested a recess. Counsel had deposed the victims and had discussed the depositions with Carman before trial and the victims testified consistent with their depositions. Defense counsel stated that, after the trial commenced, he had been "engaged in defending [Carman] and not monitoring his progress . . . ."

At the beginning of Carman's sentencing hearing, the trial court denied Carman's motion for a new trial. The trial court "t[ook] [Carman] at his word" that he had taken some medicine and had determined that a continuance was unnecessary because he did not appear intoxicated and "answered all the questions

9

appropriately." Carman's argument that he was intoxicated, the trial court reasoned, was "belied" by the fact that neither Carman nor his attorney requested a recess. Even if Carman had been intoxicated, the trial court reasoned, no new trial was necessary because Carman had not proved that he had been prejudiced. The trial court found that defense counsel had time but failed to confer with Carman about the victims' testimonies; it would have questioned Carman's competence "had those witnesses testimonies been exceedingly different than what they said at their deposition"; and it was equally plausible that Carman chose not to make notes because the victims' testimonies did not differ. The trial court sentenced Carman to a mandatory term of life without the possibility of parole for the sexual battery of S.M. and to two terms of 95 days in the county jail for battering G.C. that would run concurrently with each other and to Carman's life sentence.

## B.  Carman's Direct Appeal

Carman argued, for the first time on appeal, that the trial court *sua sponte* should have conducted a competency hearing. Carman argued that a hearing should have been held because there were "reasonable grounds" to believe that he was not competent to stand trial. *See* Fla. R. Crim. P. 3.210(b). Carman also argued that the trial court had violated his right to procedural due process by failing, on its own initiative, to hold a competency hearing. *See Medina v. California*, 505 U.S.

437, 112 S. Ct. 2572 (1992); *Pate*, 383 U.S. 375, 86 S. Ct. 836. The First District Court of Appeals affirmed summarily Carman's convictions and sentences.

### C. Carman's Petition for Habeas Corpus Relief

Carman filed in the district court a petition for a writ of habeas corpus and alleged the violation of his right to procedural due process. The state answered that Carman was relying "on a factual basis not fairly presented to the *trial* court at the time a continuance was requested" and Carman's *Pate* argument was unexhausted. The state also answered that Carman's behavior before and during trial "failed to raise a bona fide doubt as to his competency to proceed" because he "had no history of incompetency or mental illness"; "[h]is dosage had not been deliberately increased"; and "nothing happened during the morning session, in particular, to raise a doubt about [his] competency."

The district court denied Carman's petition. The district court ruled that "Carman ha[d] failed to demonstrate [that] the state court's rejection of []his claim relied upon an unreasonable determination of the facts or constituted an unreasonable application of clearly established federal law." The district court determined that the trial court "did not abuse its discretion in denying [Carman's] request for a continuance." The district court also determined that "the trial court did not err in failing to sua sponte order a competency evaluation" because "[t]he record support[ed]" its "implicit[], if not explicit[], f[inding that there were] no

11

reasonable grounds to suggest that Carman was not competent or [that] a bona fide doubt necessitat[ed] a competency hearing."

## II. STANDARDS OF REVIEW

We review *de novo* the denial of a petition for a writ of habeas corpus. *Moore v. Campbell*, 344 F.3d 1313, 1321 (11th Cir. 2003). Under the Antiterrorism and Effective Death Penalty Act, a petitioner is entitled to a writ of habeas corpus only if the state court reached a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). "The decision of a state court involves an unreasonable application of clearly established federal law 'if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case.'" *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 407, 120 S. Ct. 1495, 1520 (2000)). We presume that the findings of fact by the state court are correct so long as they are supported by the record. 28 U.S.C. § 2254(e)(1); *Fallada v. Dugger*, 819 F.2d 1564, 1569 n.3 (11th Cir. 1987).

## III. DISCUSSION

Our discussion is divided in two parts. First, we address the argument of the State that Carman failed to exhaust his claim. Second, because we conclude that

12

Carman exhausted his claim, we address whether the decision of the state court involved an unreasonable application of clearly established federal law.

### A. Carman Exhausted His Claim for Purposes of Federal Review.

Carman properly presented his *Pate* argument to the Florida courts. Before trial, defense counsel expressed reservations about Carman's ability to "assist in his defense," and after the trial court found that Carman was competent to proceed, defense counsel moved, unsuccessfully, for a continuance. Carman was not required, as the State argues, to request that the trial court conduct a competence hearing. *See Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1249, 1253 (11th Cir. 2002) (recognizing that, although the petitioner "never requested that the trial court conduct a hearing on . . . whether [he] was mentally competent to stand trial," his "mental incompetency procedural due process claim . . . was timely raised on direct appeal and rejected on the merits without discussion by the Fourth District Court of Appeal"). It is not as though defense counsel failed to broach the subject of Carman's competency and, even if that were the case, that would "not [be] dispositive . . . [and would serve as] evidence that [Carman's] competency was not really in doubt." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996). A "*Pate* claim[] can . . . be raised on direct appeal," *James v. Singletary*, 957 F.2d 1562, 1572 (11th Cir. 1992), and Carman argued to the Florida appellate court that the trial court violated his right to due process by ignoring objective information

13

that created a bona fide doubt about his competency to stand trial, *see Pate*, 383 U.S. at 384–86, 86 S. Ct. at 841–42. The decision of the state court to reject Carman's argument summarily qualifies as an adjudication on the merits and is entitled to deference on habeas corpus review. *Wright*, 278 F.3d at 1253–54.

### B. The Florida Appellate Court Did Not Unreasonably Apply Clearly Established Federal Law.

"The failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Fallada*, 819 F.2d at 1568. To be incompetent, the defendant must lack the "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as a factual understanding of the proceedings against him.'" *Watts*, 87 F.3d at 1286 (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 789 (1960)). A defendant's right to due process is violated when the trial court fails *sua sponte* to conduct a competency hearing when it has before it evidence that creates a bona fide doubt about the defendant's competency to proceed with his trial. *Pate*, 383 U.S. at 384–86, 86 S. Ct. at 841–42. The "petitioner shoulders the burden of proving that objective facts known to the trial court were sufficient to raise a bona fide doubt as to [his] competency." *McNair v. Dugger*, 866 F.2d 399, 401 (11th Cir. 1989).

14

To determine whether there existed a bona fide doubt as to the defendant's competency, a reviewing court must "focus on what the trial court did in light of what it then knew." *Fallada*, 819 F.2d at 1568. Evidence about the defendant's mental condition, any irrational behavior on his part, and his demeanor at trial are all relevant, "but 'there are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed.'" *Watts*, 87 F.3d at 1287 (quoting *Drope v. Missouri*, 420 U.S. 162, 180, 95 S. Ct. 896, 908 (1975)). The defendant's use of drugs is not accorded any special treatment; it is just another "relevant factor" in the analysis. *Fallada*, 819 F.2d at 1569.

The Florida appellate court determined that the trial court did not violate Carman's right to due process, and that decision is not contrary to or an unreasonable application of clearly established federal law. The objective facts known to the trial court did not create a bona fide doubt about Carman's competency to stand trial. Despite the assertions made by defense counsel and Carman's family before trial that Carman was unable to assist in his defense, Carman's colloquy with the trial court reflects that he was coherent, articulate, and understood the seriousness of his trial.

None of the information presented to the trial court suggested that Carman was unable to consult with his counsel or failed to understand his criminal

15

proceedings. Carman engaged in an "intelligent colloquy" with the trial court about his decision to abandon his motion to sever and about the effect of the prescription medication that he had consumed. *See Card v. Dugger*, 911 F.2d 1494, 1519 (11th Cir. 1990). Carman reported that he had taken one dose of an anti-anxiety medication to help him sleep and, although it made him "groggy," it did not affect his lucidity. When Carman stated that the medicine "might" have slowed his reaction time, the trial court compensated for the alleged difficulty by granting Carman an unqualified right to obtain a recess. Neither Carman nor his counsel asked for a recess. And counsel, who was "in the best position to . . . [assess] Carman's competency," never complained during trial that Carman was not assisting in his defense. *See Watts*, 87 F.3d at 1288. The trial court, which had "pa[id] close attention to Mr. Carman . . . and . . . noticed [that] he was making notes and so forth during the course of the trial," found that Carman "ha[d] been able to help" in his defense, and defense counsel did not dispute that finding. Immediately thereafter, Carman acknowledged that he was "feeling better."

Carman argues that other evidence created a bona fide doubt as to his competency, but we cannot say that it was unreasonable for the state court to reach a contrary conclusion. Carman argues that his gestures to the jury suggested that he was incompetent, but it is equally plausible that Carman reacted to the accusations being leveled against him by vigorously denying any wrongdoing. *See Dusky*, 362

16

U.S. at 402, 80 S. Ct. at 789. And even if we were to assume that Carman's gestures amounted to "bizarre . . . [or] irrational behavior[,] . . . [that was not enough to] be equated with mental incompetence to stand trial." *See Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995). Carman contends that the evidence about his attempted suicide suggested that he was incompetent, but we "may consider only the information before the trial court before and during trial." *James*, 957 F.2d at 1572.

The Florida appellate court did not unreasonably apply clearly established federal law when it determined that the trial court afforded Carman all the process required to ensure that he was competent to stand trial. *See Watts*, 87 F.3d at 1290. The trial court accepted Carman's representation that he had taken medicine several hours before his trial, but the trial court did not have any evidence before it to suggest that Carman could not understand his criminal proceedings and assist in his defense. And Carman failed to establish that the trial court failed to account for any evidence that would have created a bona fide doubt about his competency to stand trial.

## IV. CONCLUSION

We **AFFIRM** the denial of Carman's petition for a writ of habeas corpus.