**David Eugene JOHNSTON,**
**Petitioner–Appellant,**

v.

**Harry K. SINGLETARY, Jr. Secretary,**
**Florida Department of Corrections,**
**Respondent–Appellee.**

Nos. 93–3407, 96–2538.

United States Court of Appeals,
Eleventh Circuit.

Dec. 8, 1998.

Thomas M. Goggans, Montgomery, AL, for Petitioner–Appellant.

Kenneth S. Nunnelly, Asst. Atty. Gen., Dept. of Legal Affairs, Daytona Beach, FL, for Respondent–Appellee.

Before EDMONDSON, BIRCH and BLACK, Circuit Judges.

PER CURIAM:

David Eugene Johnston appeals the district court's orders denying his petition for habeas corpus relief filed pursuant to 28 U.S.C. § 2254. For the reasons that follow, we affirm the district court's decision to deny the writ.[1]

## I. BACKGROUND

We briefly summarize the facts underlying Johnston's conviction for capital murder: On November 5, 1983, at approximately 3:30 a.m., Johnston called the police department in Orlando, Florida, identified himself as Martin White, and advised a police officer that someone had killed his grandmother. Johnston also informed the police of the location where the murder had occurred. The police subsequently went to the address sup-

---

1. Johnston filed his petition for writ of habeas corpus before April 26, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA standard of review provisions therefore are inapplicable to this appeal. See Lindh v. Murphy, 521 U.S. 320, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997); see also Oats v. Singletary, 141 F.3d 1018, 1021 n. 1 (11th Cir.1998).

plied by Johnston and found the dead body of eighty-four year old Mary Hammond. The body revealed evidence of multiple stab wounds and manual strangulation. The police arrested Johnston for Hammond's murder after noticing that his clothes were blood-stained, his face was scratched, and his statements to the police were inconsistent. Other evidence presented at trial also linked Johnston to Hammond's murder: (a) Johnston worked at a demolition site nearby Hammond's home, and the police discovered several of Hammond's household belongings in a pillowcase of a front-end loader parked at the demolition area; (b) a watch that Johnston wore shortly before the murder was found covered with blood in Hammond's home and a pin that Johnston wore on the morning of the murder was found entangled in Hammond's hair; and (c) the police discovered a print matching Johnston's shoe outside the kitchen window of Hammond's house.

A jury convicted Johnston of Hammond's murder and recommended a death sentence. The trial court imposed a sentence of death after finding as aggravating factors that Johnston previously had been convicted of a violent felony; that this offense had been committed in the course of committing a burglary; and that the murder was especially heinous, atrocious, or cruel. The Florida Supreme Court affirmed the conviction and sentence, *Johnston v. State*, 497 So.2d 863 (Fla.1986), and denied Johnston's subsequent state petitions for habeas corpus and for post-conviction relief under Florida Rule of Criminal Procedure 3.850. *Johnston v. Dugger*, 583 So.2d 657 (Fla.1991).

Johnston next filed a petition for habeas corpus in federal district court. Johnston raised twenty issues in the petition; the district court denied the writ as to eighteen of these issues and ordered that the writ conditionally issue as to two remaining, related claims. Specifically, the court determined that, pursuant to the Supreme Court's decision in *Espinosa v. Florida*, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), the trial court's instruction to the jury on the "heinous, atrocious, and cruel" aggravating factor was unconstitutionally vague and had been improperly considered by the jury.

The court further found that, in addressing this claim in Johnston's state petitions for post-conviction relief, the Florida Supreme Court had failed explicitly to (1) articulate an independent and adequate state procedural ground for rejecting the claim, (2) apply a limiting construction and concomitant re-weighing of the invalid jury instruction, or (3) perform a harmless error analysis with respect to the jury's improper consideration of this factor. Noting that "only Florida courts can determine the proper approach to Petitioner's sentencing," R3–42 at 28, the court ordered that the writ conditionally issue

> within sixty (60) days from the date of this Order, unless the State of Florida initiates appropriate proceedings in state court. Because a new sentencing hearing before a jury is not constitutionally required, the State of Florida may initiate whatever state court proceedings it finds appropriate, including seeking a life sentence or the performance of a reweighing or harmless error analysis by the Florida Supreme Court.

*Id.*

Johnston moved to alter or amend the judgment with respect to those claims on which the district court had denied habeas relief; the court denied the motion and both Johnston and the state appealed the district court's judgment. We granted Johnston's application for a certificate of probable cause to appeal and, at the same time, granted respondent-Singletary's motion to hold the appeal in abeyance pending the Florida Supreme Court's disposition of the issues raised by the district court's conditional issuance of federal habeas relief. *See* R3–56. The Florida Supreme Court "reopened" the case based on the district court's directive and decided that (1) Johnston's challenge to the "heinous, atrocious, or cruel" jury instruction was procedurally barred and (2) even if the issue were not procedurally barred, the erroneous instruction would not have affected the jury's recommendation or the trial court's sentence. *Johnston v. Singletary*, 640 So.2d 1102, 1104 (Fla.1994), (*Johnston I*), cert. denied, 513 U.S. 1195, 115 S.Ct. 1262, 131 L.Ed.2d 141 (1995). The district court subsequently evaluated the Florida Supreme Court's decision

and denied federal habeas relief as to all claims. Johnston's appeal to this court proceeded and Singletary's appeal was dismissed. In the meantime, Johnston had filed in state court another motion for post-conviction relief as well as a petition for habeas corpus; the Florida Supreme Court denied both the motion and the petition. *Johnston v. Singletary,* 708 So.2d 590 (Fla.1998) (*Johnston II* ).[2] Johnston's only remaining claims for collateral relief, therefore, are contained in the instant federal habeas petition.[3]

## II. DISCUSSION

### A. *Competency to Stand Trial*

Johnston submits that he was incompetent to stand trial. Johnston's incompetency claim contains several distinct procedural and substantive components: First, Johnston contends that his trial counsel was ineffective for failing to inform the court about Johnston's deteriorating mental condition prior to and during the course of the trial and, as a result of this failure, that the court failed to hold a competency hearing. Second, Johnston argues that the state violated his right to due process under the Fourteenth Amendment by trying him while incompetent. We address each of these contentions in turn.

■ Johnston correctly notes that in *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the Supreme Court decided that the prohibition against trying an incompetent defendant necessarily required the trial court to hold a competency hearing *sua sponte* when presented with information that raises a "bona fide doubt as to the petitioner's competency," *James v. Singletary,* 957 F.2d 1562, 1570 (11th Cir.1992).[4] Johnston contends that his counsel's failure

to provide the court with available information concerning Johnston's increasingly impaired mental state effectively deprived the court of precisely the information it needed to entertain a "bona fide" doubt as to his competence. Johnston further argues that this deficient performance caused the trial court's concomitant failure to hold a competency hearing as required by *Pate v. Robinson.*

■ It is well established that in order to obtain habeas corpus relief based on ineffective assistance of counsel with respect to a conviction or death sentence, a defendant must show both that (1) the identified acts or omissions of counsel were deficient, or outside the range of professionally competent assistance, and (2) counsel's deficient performance prejudiced the defense such that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Oats,* 141 F.3d at 1023 (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). We previously have observed that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate." *Rogers v. Zant,* 13 F.3d 384, 386 (11th Cir.1994) (internal quotation marks and citation omitted). Because constitutionally acceptable performance is not narrowly defined, a petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden. *Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (en banc).

■ First, although not addressed in the district court's order, we note that Johnston's claim of ineffective assistance of counsel for

---

**2.** We note that the procedural history in this case is somewhat more complex than our brief overview indicates; in the interest of clarity, however, we have summarized only those portions of the procedural background that remain relevant to Johnston's appeal.

**3.** The following claims for relief are without merit and do not warrant further discussion: (1) Lack of exhaustion of state remedies; (2) unconstitutional reliance on the "heinous, atrocious, or cruel" instruction as a permissible aggravating circumstance; (3) Johnston's waiver of his *Miranda* rights was unknowing and involuntary; (4)

trial counsel was ineffective for stipulating to Johnston's identity with respect to a prior offense; and (5) improper admission into evidence of prior convictions for making a terroristic threat and committing battery on a police officer.

**4.** A defendant is considered competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and [if] he has a rational as well as factual understanding of the proceedings against him." *James,* 957 F.2d at 1574 (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)).

failure to raise competency immediately before and during the course of the trial is procedurally barred. Johnston raised a substantive competency claim [5] in his state post-conviction motions, but he has presented his analytically distinct claim of ineffective assistance of counsel for failure to reassert the competency issue——and the accompanying deprivation of an evidentiary hearing to which he otherwise would have been entitled——for the first time in his federal habeas corpus petition. We previously have held that "habeas petitioners generally may not raise ineffective assistance of counsel claims except on grounds specifically presented to the state courts." *Jackson v. Herring*, 42 F.3d 1350, 1355 (11th Cir.1995) (discussing *Footman v. Singletary*, 978 F.2d 1207 (11th Cir.1992)). Because Johnston did not raise this specific allegation of ineffective assistance in any state court proceeding, our circuit precedent dictates that the claim is procedurally barred.

Even if Johnston's ineffective assistance claim were not procedurally barred, however, we conclude that Johnston has not satisfied his burden to show that his trial counsel was legally ineffective for failing to apprise the court of information that, according to Johnston, would have compelled a *Pate v. Robinson* hearing. On January 3, 1984, Johnston's trial counsel requested that the court order a psychiatric examination by two psychiatrists to determine whether Johnston was competent to stand trial. Drs. Robert Pollack and J. Lloyd Wilder examined Johnston in jail on January 17th and 11th, 1984, respectively; on March 2, 1984, the trial court conducted a competency hearing, at which both doctors testified. Pollack testified that Johnston had a narcissistic personality that could affect his ability to relate to his attorney; Pollack further opined, however, that Johnston was competent to stand trial. Wilder testified that he had observed in Johnston elements of a "sociopathic personality," Exh. 7 at 1055, but that despite Johnston's history of psycho-

logical problems, Johnston nonetheless was competent to stand trial. *Id.* at 1058. Consistent with these medical evaluations, the trial court decided that Johnston was competent to stand trial. Trial commenced on May 14, 1984; the jury returned a guilty verdict five days later.

■ Johnston argues that his trial counsel was under a continuing obligation to inform the court as to his deteriorating mental state and his accompanying inability to communicate with counsel in preparation for trial. We acknowledge that, under certain circumstances, trial counsel's failure to apprise the court of a client's changing mental state-thereby depriving the court of critical information regarding its *own* potential duty to hold a *Pate v. Robinson* hearing-can constitute ineffective assistance. *Cf. Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995) ("Even if a defendant is mentally competent at the beginning of his trial, the trial court must continually be alert for changes which would suggest that he is no longer competent.") (citation omitted). Here, however, it is undisputed that counsel explicitly expressed reservations regarding Johnston's competency from the outset—as evidenced, for instance, by counsel's request that the court order a psychological evaluation prior to trial. In response to these concerns, the trial court held a competency hearing and found Johnston to be competent to stand trial. There is scant evidence, however, indicating that Johnston's condition worsened from January, when the court-appointed psychiatrists conducted their examinations, to May, when the trial commenced. Stated differently, although the record supports the assertion that trial counsel regarded Johnston as potentially incompetent prior to the January psychiatric evaluation by Pollack and Wilder, there is little evidentiary support for the proposition, argued here, that Johnston's mental state deteriorated after those examinations such that counsel was bound to advise the court that Johnston had become,

---

5. For purposes of this discussion, we differentiate between Johnston's "substantive" competency claim, based on the contention that he was tried while incompetent in violation of the Fourteenth Amendment's Due Process Clause, and his ineffective assistance of counsel claim, based on

the assertion that counsel was professionally unreasonable in failing to alert the court as to Johnston's impaired mental state, thereby depriving Johnston of an evidentiary hearing to which he otherwise would have been entitled.

in essence, *more* incompetent than he had been when the examinations were conducted. At the evidentiary hearing on Johnston's motion for post-conviction relief in state court, Clyde Wolfe, one of Johnston's trial attorneys, testified as follows:

Q: During your various discussions with Mr. Johnston throughout this case, did you-did he seem to appreciate the nature of the charges and the allegations against him?

A: Yes.

Q: He knew that he was charged with first-degree murder?

A: Yes.

Q: Knew the potential punishment was death?

A: Yes.

Q: Did he understand, at the time he went to trial, that you were his attorney, the police and the prosecutors were on the other side? It was an adversarial situation?

A: Yes.

Exh. 19 at 120–21. Christine Warren, who assisted Wolfe during Johnston's trial, offered the following testimony regarding Johnston's comportment as the trial progressed:

Q: Okay. At the time of the trial, he sat and, and demonstrated appropriate courtroom demeanor, did he not?

A: Yes.

Q: During the trial, did you discuss with him either in verbally or written notes, the evidence the way it was going; its implications?

A: Yes.

Q: Was he able to understand and follow that?

A: Yes.

Q: Discuss it with you rationally?

A: Yes.

Q: At the trial, you were aware of the requirements of the newer rule for competency, is that correct?

A: Yes.

Q: At the trial, do you have an opinion as to whether Mr. Johnston was competent?

A: I think he knew what was being said. I think he understood what the witnesses were saying. I think he understood the legal arguments as much as most laymen could. He spoke with us logically during the trial. I think, let me think. He was able to sit still. I'm trying to run through the standards in my mind. I mean, he was able to do all of those things.

*Id.* at 188–89.

We readily acknowledge that these attorneys also testified to the difficulty in communicating with Johnston and to their generalized view that he was mentally unstable[6]; there is no testimony or evidence that would indicate, however, that these attorneys observed or experienced a noticeable change or deterioration in Johnston's condition such that their failure to provide the court with additional information (beyond that which they had already provided in requesting a psychiatric evaluation) regarding Johnston's continuing mental instability constituted ineffective assistance of counsel. In reaching this determination, we do not argue with Johnston's current assertion that his mental condition may have taken a turn for the

---

**6.** Wolfe, for instance, provided the following description of his rapport with Johnston prior to trial:

It was a changing rapport. Some days he would be suspicious of me, Miss Warren, or Mr. Durocher or anybody from our offices. Some days he would be easy to get along with, easy to talk to. Some days he would not want to talk about anything except tangential issues that were pressing on his mind. And that would take up a great deal of time to try to get the conversation around to what had to be discussed.... [F]rom talking with him, talking with Mr. Johnston, you had the suspicion that he had some mental problems.

Exh. 19 at 22–23, 24. Warren offered similar testimony regarding her impression of Johnston's mental state:

I do know that from the beginning of the representation, it was clear to me that he had some serious psychiatric problems.... I could tell him something, and fifteen minutes later, it would become clear that he did not understand what I had said. In fact, really couldn't—I don't know if remember is the right word, but did not incorporate it into his consciousness. He made bizarre comments and statements. Was very childish; very demanding.

*Id.* at 144.

worse during the time leading up to or during trial; we do conclude, though, that the record does not reveal such a deterioration. As a result, we have no basis on which to find counsel's performance deficient with regard to this claim.

█ Johnston also raises a separate challenge to the district court's finding that he was competent to stand trial. The district court, relying on the Florida Supreme Court's determination that Johnston's substantive competency claim was procedurally barred for failure to raise the issue on direct appeal, found the claim to be procedurally barred on federal habeas review; in the alternative, the district court concluded that the state court's findings regarding competency were entitled to deference and fairly supported by the record. Our own case law regarding substantive competency claims raised in collateral proceedings establishes, however, that "the procedural default rule of *Wainwright v. Sykes* ... does not operate to preclude a defendant who failed to ... pursue a claim of competency on direct appeal from contesting his competency to stand trial and be sentenced through post-conviction proceedings," *Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir.1985). *See also Medina*, 59 F.3d at 1107 ("The *Sykes* procedural default rule does not ... preclude review of the merits of a postconviction incompetency claim, even if the claim was not raised on direct appeal."). The district court acknowledged that a claim regarding competency generally cannot be procedurally defaulted under this circuit's precedent, but pointed to other Eleventh Circuit decisions in which we stated that "once the issue of competency to stand trial is raised and the state court takes the proper steps to resolve the issue, the defendant is [not] free to drop the issue or later pick it up as it suits his purposes." *Thomas v. Wainwright*, 788 F.2d 684, 688 (11th Cir.1986). The state asks that we avail ourselves of the *Thomas* procedural exception to the "no procedural default" rule articulated in *Adams* and find Johnston's

substantive competency claim to be procedurally barred.

There is no evidence in this case, however, to indicate that Johnston has attempted to manipulate the appeal or post-conviction process or to abuse the writ by invoking the competency issue in a piecemeal fashion; indeed, unlike the petitioner in *Thomas*, who raised the competency issue at trial but failed to raise it again until his second state post-conviction motion and second federal habeas petition, Johnston has raised competency consistently since his initial motion for state post-conviction relief. Although we acknowledge that *Thomas* does not enunciate a clear standard to appraise the extent to which a petitioner's failure to raise a claim consistently might constitute "drop[ping] the issue or later pick[ing] it up as it suits his purposes," neither the state nor the district court has shown how Johnston has done so in this case.

█ We therefore proceed to evaluate the merits of Johnston's contention that he was tried and convicted while mentally incompetent. To show entitlement to an evidentiary hearing on a substantive competency claim, a petitioner must present "clear and convincing evidence creating a real, substantial and legitimate doubt as to his competence to stand trial," *Medina*, 59 F.3d at 1106 (internal quotation marks and citations omitted). A petitioner who raises a substantive competency claim must demonstrate his incompetence by a preponderance of the evidence. *See James*, 957 F.2d at 1571.[7] A district court's determination that there is insufficient evidence to generate a substantial and legitimate doubt as to a petitioner's competence to stand trial is reviewed for clear error. *Medina*, 59 F.3d at 1106 (citing *Card v. Singletary*, 981 F.2d 481, 483–84 (11th Cir.1992)).

As previously mentioned, two psychiatrists, Drs. Wilder and Pollack, evaluated Johnston's competency to stand trial five months prior to trial. Wilder and Pollack each spent approximately fifty minutes con-

7. For the sake of clarity, it is worth emphasizing that the evidence that a petitioner must produce in order to receive an evidentiary hearing must be sufficient under the "clear and convincing" standard to create a *doubt* as to his competency. In order to actually prevail on such a claim, the petitioner must prove by a preponderance of the evidence that he was, in fact, incompetent to stand trial.

ducting a psychological examination of Johnston and testified at the competency hearing that they found him to be competent. *See, e.g.,* Exh. 7 at 1037 and 1050–51. In a written report submitted to the court, Pollack offered the following observations about Johnston:

> Thought content reflects a significant amount of pathological narcissism, difficulty in delaying gratification, poor frustration tolerance, and a significant amount of grandiosity and inflated sense of self-worth. His thought processes are grossly intact with no evidence of any cognitive dysfunction. His intelligence functions are intact and he seems to be within the average range of intelligence. His level of insight is poor, his judgment is poor, and there appears to be no suicidal or homicidal ideation at present.
>
> At the present time, I feel that Mr. Johnston is competent to stand trial. He certainly is aware of the nature of the charges pending against him and the range and nature of possible penalties. He understands clearly the adversary nature of the legal process and has the capacity to disclose to his attorney pertinent facts surrounding the alleged offense. He is able to aid and assist his attorney in preparing a defense, relate to him, and to realistically challenge prosecution witnesses. He is capable of manifesting appropriate courtroom behavior, testifying relevantly and assisting himself in the legal process. He can certainly cope with the stress of incarceration prior to trial and he certainly will do his best to manipulate the system to place him in a more comfortable setting.

Evidence Folder at A. In his report, Wilder noted that he had conducted a similar psychological examination of Johnston two years earlier and that

> [s]ince that time, [Johnston] has spent a lot of time in the law library and is even better informed on those matters which

are considered in determining a defendant's competency to stand trial. Also, in spite of a past history of mental illness, he does not suffer from such an illness at this time to the extent that it renders him incapable of using that knowledge.

Evidence Folder at B. Wilder and Pollack testified that, after submitting these written reports to the court, they each received further information regarding Johnston's previous psychological history; they further observed that this later information did not alter their previous recommendations. *See* Exh. 7 at 1041 and 1052. Consistent with Pollack's and Wilder's professional opinions, the trial court concluded that Johnston was competent to stand trial. Similarly, at Johnston's 3.850 hearing on his state motion for collateral relief (which occurred approximately five years after Johnston's trial and conviction), Wilder again testified as to his professional evaluation that Johnston was competent to stand trial.

In a marked departure from the earlier competency hearing, two other psychiatrists-Drs. Patricia Fleming and James R. Merikangas-testified that, based on their evaluations of Johnston prior to the 3.850 evidentiary hearing, Johnston suffered from mental illness and organic brain damage that would have rendered him incompetent to stand trial in May 1984. *See* Exh. 20 at 266 and 379. Fleming testified that Johnston suffered from "organic brain syndrome; schizophrenia undifferentiated with paranoid features and substance abuse." *Id.* at 252. Merikangas, similarly, testified that Johnston

> suffers from delusions, hallucinations and a complex disorder of logical thought, which causes him not to be able to judge his environment and react to it in a way that normal people do.

*Id.* at 366. The state court thus encountered diametrically opposite expert testimony regarding Johnston's competency at the time of trial.[8] Faced with these opposing view-

---

8. It is worth noting that both Pollack and Wilder also opined that Johnston likely was competent at the time of the offense. *See* Evidence Folder at A and B. Merikangas, conversely, testified that, at the time of the offense, Johnston was unable to form a specific intent with respect to the commission of the offense. *See* Exh. 20 at

382. Fleming testified that, although she did not have a "sufficient basis to state he was insane at the time of the crime," *id.* at 283, her judgment was that Johnston's "psychotic condition . . the known brain damage, the excessive alcohol use would . . . create a condition that he was insane at the time of the crime." *Id.*

points, the court decided to "reject[ ] the opinion testimony of [Fleming and Merikangas] because of their bias, the fact that their evaluations were made long after the events in question, and because their opinions are contradicted by other credible evidence and not supported by the law." Exh. 30 at 1680. Having independently reviewed the transcripts of both the initial competency hearing and the subsequent hearing on Johnston's 3.850 motion, we conclude that the trial court's finding of competence is supported by the record. *See Medina,* 59 F.3d at 1111 ("The trial court's finding that [petitioner] was competent to stand trial is presumed to be correct and may not be overturned if it is fairly supported by the record."). In reaching this determination, we are particularly mindful of the fact that, unlike Fleming and Merikangas, who examined Johnston years after the trial occurred, Pollack and Wilder conducted their examinations much closer to the time of the offense and found that Johnston was competent to stand trial. Based on the testimony and record evidence discussed above, the district court did not clearly err in determining that Johnston had failed to present clear and convincing evidence that "positively, unequivocally, and clearly generate legitimate doubt" as to his competence to stand trial. *Id.* (internal quotation marks and citation omitted).

B. *Ineffective Assistance of Counsel at Penalty Phase*

■ Johnston contends that his trial counsel was ineffective at the penalty phase for failing to present available evidence in support of statutory or non-statutory mitigating circumstances. Specifically, Johnston suggests that counsel failed to call as witnesses, or obtain affidavits from, Johnston's family members who would have testified as to the brutality that characterized Johnston's childhood. Trial counsel, however, did elicit testimony from Johnston's step-mother, Corrine Johnston, who testified in some detail regarding both the abuse Johnston suffered at the hands of each of his parents and the lasting effects of this mistreatment that became apparent as Johnston grew older. *See* Exh. 43 at C. Even assuming that other family members were available and willing to testify on Johnston's behalf (and this is by no means clear), the record coupled with Johnston's own representations on this issue indicate that these other witnesses would have confirmed and reiterated the testimony already offered by Corrine Johnston. Although we do not discount the value of cumulative testimony in the penalty phase of a capital trial, we cannot say that counsel's decision to present some, but not all, available mitigating evidence with respect to Johnston's family history——particularly when it appears that those individuals who were not called to testify would have testified to essentially the same events Corrine Johnston described in her testimony—constituted ineffective or deficient performance. *See Waters,* 46 F.3d at 1511 ("[W]e have never held that counsel must present all available mitigating circumstance evidence in general . . . in order to render effective assistance of counsel.").

■ Johnston also argues that he received ineffective assistance of counsel at the penalty phase because trial counsel knew that Johnston was mentally impaired and yet, for no strategic reason, failed to conduct further necessary investigation, obtain expert testimony regarding his mental state, or object to aspects of the prosecution's expert psychiatric testimony. Further, Johnston avers that such evidence of a psychiatric disorder would have constituted mitigating evidence that the jury and court should have been permitted to consider before rendering their respective decisions to recommend and impose the death sentence.

At the penalty phase of Johnston's trial, his trial counsel elicited testimony from Kenneth J. Cotter, an attorney who previously had represented Johnston in both criminal and civil matters. Cotter testified that Johnston regularly received a Social Security disability check but that, because Johnston was "basically unable to administer his money," Exh. 43 at D, Cotter kept the funds in an escrow account and dispersed them to Johnston. *See id.* Cotter further stated that, based on his frequent contact with Johnston, he had observed that Johnston

has tremendous mood swings that I noticed very often in seeing him at my office,

or conversations on the telephone. I could talk to him at times and he would seem relatively cheerful. We would hold a normal conversation, and he could call me back the next day and be very depressed and crying on the phone and-this was constant, you know, just very severe mood swings.

*Id.* at D. As previously mentioned, Corrine Johnston, Johnston's step-mother, also testified as to both the circumstances surrounding Johnston's upbringing and to the way in which these conditions affected Johnston. For example, Corrine Johnston recounted that

David was a very, very nervous child. He could not even hold a cup of water. He— he didn't even know the meaning of playing with other children, whatsoever.... [David's relatives] said that David's mother, would sit David, when he was three or four years old, in front of the T.V. for hours without the T.V. on or anything. Also, I was told that on numerous occasions when he was really little, that he got a lot of cuts, scratches, which she carried him to the doctor; that I was told that she had did.... On one occasion, there's a number of them-but on one particular occasion, David beat our stereo up. Then he got toothpaste and tried to glue the pieces back together.... On another occasion, David was about thirteen or fourteen; all the children were in school, and I went in to clean the boys' room, and on one mattress, there was a hole cut in the mattress where it had been urinated down through; there was a radio plugged up; I have no idea what David's intentions were about this. We questioned David; we asked him about this, and the only answers we ever got was he didn't know.

*Id.* at C, 1136–37.

In rebuttal, the state's attorney called Dr. Pollack, who had examined Johnston several months prior to the trial and rendered an evaluation with respect to Johnson's competency to stand trial. After being qualified as a psychiatric expert, Pollack and the prosecutor engaged in the following exchange:

Q: Now, as a result of your interview and examination of Mr. Johnston, did you come to some kind of opinion as to whether Mr. Johnston was sane or insane at the time of the offense in this case, November the 5th of 1983?

. . . .

A: Yes, sir, I did.

Q: And what is your opinion?

A: I felt that at that time he was considered to-I would consider him to be legally competent; therefore, legally sane.

Q: All right. Now do you have an opinion as to whether at the time of the commission of this particular offense, again, November the 5th of 1983, whether Mr. Johnston suffered from either an extreme mental or emotional disturbance?

A: Yes, sir, I have such an opinion.

Q: And what is your opinion?

A: At that particular time, I believe his level of function was fairly consistent with his usual pattern; therefore, I didn't see any evidence or indication of any undue stress at that time.

Q: All right. And, Doctor, as to the time of the commission of this offense, November the 5th of 1983, do you have an opinion as to whether Mr. Johnston was able to appreciate the criminality of his conduct, and was he able to conform his conduct to requirements of law, or was that substantially impaired?

A: I believe that he had such ability, and there was no functional impairment in his ability to understand the nature of his acts then.

*Id.* at E.

Johnston argues that his trial counsel knew that he was mentally ill; that counsel viewed the court-ordered psychiatric examinations to be cursory and unsatisfactory; and that any competent attorney representing Johnston at the penalty phase would have presented a mental health expert to counter the testimony offered by the state's expert (and only) witness, Pollack.

The record reveals, however, that Johnston's attorneys did attempt to retain the services of a third psychiatric expert, Dr. William Tell, precisely to refute the testimony offered by Pollack and to elicit an evalua-

tion that would reflect what they perceived to be Johnston's mental instability. At the evidentiary hearing on Johnston's state 3.850 motion, for example, Clyde Wolfe offered the following testimony:

Q: There was a motion for a competency determination and Doctor Pollack and Wilder were appointed. Does that conform to your recollection?

A: Yes.

Q: And then you obtained the appointment of a psychologist?

A: Yes.

Q: And do you recall how that occurred?

A: I wanted someone who would spend a little bit more time with David and to give him some tests. Try to, try to conduct some objective tests.... I wanted someone who would go and spend some time with it—Doctor Tell had indicated that he ... wanted to get more involved in the forensic psychology aspect of his practice. And after, you know, discussions with him prior to David's, David Johnston's case, it seemed that he was going to be doing more of the objective testing and talking with him and listening and spending more time than, than we would have expected from either the psychiatrists.

. . . .

Q: Now, did Doctor Tell indicate that Mr. Johnston refused to see him?

A: I believe David did refuse to see him.

Q: Do you recall if you talked to David about that?

A: Yes.

Q: What did he indicate?

A: Well, I believe both Christine [Warren] and I went and tried to explain to him why it was important to cooperate with Doctor Tell and try to convince him that Doctor Tell was not there to harm him or to do anything bad to him ... [b]ut had been appointed to assist us in preparing his defense and, you know, that we needed, you know, some more information about him. About David.

Q: How did David respond?

A: He didn't like it at all. His concern was he didn't want to be involved with anybody in the mental health field at all.

. . . .

Q: ... I assume that you probably brought up Doctor Tell's name again and attempt to get Doctor Tell back in to do some testing for the penalty phase. Were you successful in that regard?

A: I don't believe so.

Q: Do you recall if Doctor Tell was ever able to actually see and test David Johnston in this case?

A: I don't think he did. He—I know that I spoke with him on the telephone and he went on more than one occasion to try to see David, administer some tests and discuss with him his circumstances. I don't believe that David ever wanted to see him or allowed Doctor Tell to see him.

R3–37 at 37–46. Similarly, Christine Warren, Wolfe's trial co-counsel, testified that "[i]t was unwise of [Johnston] not to talk with the psychiatrist [Dr. Tell]." Exh. 19 at 183.

■ It is well-established in our circuit that counsel has a continuing responsibility to represent and advise a non-cooperative client, particularly when counsel knows or has reason to know that his client is mentally unstable.[9] *Blanco v. Singletary,* 943 F.2d 1477, 1502 (11th Cir.1991) ("[T]his court has held that a defendant's desires not to present mitigating evidence do not terminate counsels' responsibilities during the sentencing phase of a death penalty trial."); *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986) ("[Attorney's] explanation that he did not investigate potential mitigating evidence because of Thompson's request is especially disturbing in this case where [attorney] himself believed that [defendant] had mental difficulties. An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment.").

9. We have not ruled out that the client's instructions can, even in a death-penalty case, be a complete bar to a successful ineffectiveness-of-counsel claim. We look at the circumstances of each case.

 Notwithstanding an attorney's continuing duty to render competent professional assistance even in the absence of client cooperation, it is equally evident that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Bertolotti v. Dugger*, 883 F.2d 1503, 1514 (11th Cir.1989). In practical terms, counsel's ability to present certain types of evidence may be informed, if not sharply curtailed, by a client's refusal to cooperate. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* at 1512 (quoting *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). Similarly, when the strategy an attorney might otherwise pursue is virtually foreclosed by his client's unwillingness to facilitate that strategic option, it is difficult for our court, in a collateral proceeding, to characterize as "unreasonable" counsel's decision to abandon that otherwise preferable strategy.

 Based on the record evidence showing that—despite his lawyers' efforts to have Johnston evaluated by a third mental health expert——Johnston was steadfast in his resistance to meeting with this expert, we must conclude that Johnston's lawyers' were not ineffective with respect to the absence of expert mental health testimony at the penalty phase of Johnston's trial. Johnston unequivocally expressed his unwillingness to meet with Tell notwithstanding his lawyers' endeavors to persuade him that Tell would be sympathetic to Johnston's case. We do not see counsels' performance as deficient for failing to force Johnston to undergo an evaluation to which he was entirely opposed.[10] As we previously have observed, where "the defendant himself gives counsel reason to believe that further investigation of the defendant's mental condition would be useless or

even harmful to the defense, then the decision not to further investigate is reasonable." *Daugherty v. Dugger*, 839 F.2d 1426, 1431 (11th Cir.1988).

Moreover, we note that the documented record on which Tell necessarily would have had to rely, in the absence of a personal examination, contained considerable information regarding Johnston's criminal record and history of incarceration. Warren specifically testified that she had sought to prevent the jury from learning of the extent of Johnston's prior criminal history. *See* Exh. 19 at 160. Again, we cannot conclude that trial counsels' decision not to introduce the testimony of a psychiatric expert whose opinion would have been derived only from Johnston's medical records—records that contained potentially damaging information that the lawyers did not want the jury to consider as part of the penalty proceeding——constituted deficient performance.

Under these particular facts, we conclude that counsel was not ineffective for failing to obtain or present mental health expert testimony at the penalty phase of Johnston's trial. In reaching this conclusion, we are mindful of the facts that inform this specific case: Johnston's lawyers did attempt to have Johnston evaluated but he refused to cooperate with this effort; the record does not show that Johnston's lawyers could have obtained favorable testimony even in the absence of Johnston's cooperation; and Johnston's medical records contained a substantial amount of damaging data relating to Johnston's criminal history that his lawyers expressly sought to avoid introducing. Under these circumstances, we determine that Johnston's trial counsel did not provide ineffective assistance at the penalty phase of Johnston's trial.

### C. *Caldwell v. Mississippi claim*

 Johnston submits that, contrary to the Supreme Court's directive in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86

---

**10.** In addition, the record does not indicate that Tell would have been able to present an informed opinion regarding Johnston's mental condition—nor does the record reveal what that opinion would have been—based exclusively on Johnston's medical record. Johnston has failed to

show that Tell would have been able to offer favorable testimony notwithstanding Johnston's lack of cooperation and, as a result, that counsels' failure to present testimony derived solely from Johnston's medical records constituted ineffective assistance.

L.Ed.2d 231 (1985), both the prosecutor and the court made comments or delivered instructions during the course of the trial that misled the jury into believing that it bore only a marginal responsibility for Johnston's sentence. We note that Johnston's *Caldwell* claim has two divisible components: First, Johnston asserts a substantive claim that the prosecutor and court affirmatively misled the jury as to its role in the sentencing process. Second, Johnston argues that his trial counsel was ineffective for failing to object to the same remarks that, in his view, gave rise to a *Caldwell* violation.[11]

We conclude that both of Johnston's *Caldwell* claims are without merit. Johnston points to numerous instances in which the prosecutor reminded jurors that the court bore the final decision-making authority with respect to sentencing. While we can imagine a situation in which such remarks, viewed in isolation, might cause a jury to question its role with respect to sentencing, these remarks must not be read (and were not heard by the jurors) in isolation from numerous other comments by both the prosecutor and the court that correctly informed the jury as to its significant responsibility. During *voir dire*, for instance, the prosecutor asked whether a juror understood that, although the court ultimately imposed punishment, it "would place great weight upon whatever advisory sentence the jury recommended." Exh. 2 at 251. *See also id.* at 322 and 370 ("The Court will pay great weight to the jury's advisory sentence, but the Court does have the power under the law to override it either way.") In charging the jury during the penalty phase of the trial, the court stated, in pertinent part:

Ladies and gentlemen of the jury, it is now your duty to advise the Court as to what punishment should be imposed upon the defendant for his crime of murder in the first degree.

As you have been told, the final decision as to what punishment shall be imposed is the responsibility of myself as Judge of this court.

However, it is your duty to follow the law that will now be given to you, and to render to the Court an advisory sentence based on your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty, and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

Exh. 43 at F.

Reading the record as a whole, we do not construe the referenced comments by either the prosecutor or the court to be misleading or to undermine the jury's sense of responsibility at the penalty phase. Moreover, the prosecutor's and court's representation of the advisory role of the jury under Florida law was legally correct and, as a result, did not contravene *Caldwell*. *See Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) ("To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.") (internal citation and quotation marks omitted); *see also Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) ("[R]eferences to and descriptions of the jury's sentencing verdict in this case as

---

**11.** We disagree with the state's contention that Johnston's substantive *Caldwell* claim is procedurally barred. In response to Johnston's first motion for state collateral relief, the Florida Supreme Court found that several claims enumerated in the petition, including the *Caldwell* claim, were "without merit or ... procedurally barred because they have been or should have been raised on direct appeal." *Johnston*, 583 So.2d at 662 n. 2. We acknowledge that "alternative" holdings with respect to both the merits and procedural default, in certain circumstances, need not necessarily preclude enforcement of the state procedural bar, *see Coulter v. Herring*, 60 F.3d 1499, 1505 n. 10 (11th Cir.1995), *cert. denied*, 516 U.S. 1122, 116 S.Ct. 934, 133 L.Ed.2d

860 (1996). In this instance, however, the particular phrasing of the Florida court's decision leaves ambiguous whether the court rejected this claim on the merits or due to a procedural bar. *See Hardin v. Black*, 845 F.2d 953, 959 (11th Cir.1988) ("In the event that the federal court cannot discern on which basis the state court relied to deny collateral relief—whether because the claims were considered foreclosed by procedural default or because they were considered to lack merit—the federal court must address the claims on the merits."). We therefore proceed to address on the merits both the substantive *Caldwell* claim and the associated ineffective assistance of counsel claim premised on an alleged *Caldwell* violation.

an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell.* Those references and descriptions are not error, because they accurately characterize the jury's and judge's sentencing roles under Florida law."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1848, 140 L.Ed.2d 1097 (1998).[12] Because we find that the prosecutor's and court's comments to the jury did not serve to diminish the jurors' sense of involvement or responsibility with respect to Johnston's sentence, and because these same challenged remarks accurately described the jury's advisory role during a capital trial under Florida law, Johnston's *Caldwell* claim does not afford a basis for habeas relief. For the same reason, we further determine that Johnston cannot show any prejudice resulting from trial counsel's failure to object to remarks which did not give rise to a *Caldwell* violation; in other words, Johnston cannot demonstrate that, had counsel timely objected to the prosecutor's and court's characterizations of the jury's role at sentencing, "a reasonable probability exists that ... the result would have been different," *Huynh v. King,* 95 F.3d 1052, 1056 (11th Cir.1996) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2064). Both the substantive and ineffective-assistance-of-counsel components of Johnston's *Caldwell* claim, therefore, must fail.

### III. CONCLUSION

For the foregoing reasons, the order of the district court denying Johnston's petition for habeas corpus is AFFIRMED.

---

12. *See also Lambrix v. Singletary,* 520 U.S. 518, ——, 117 S.Ct. 1517, 1524, 137 L.Ed.2d 771 (1997) ("[In Florida,] the jury ... renders an advisory sentence of either life imprisonment or death.... The jury's advisory sentence is entitled to great weight in the trial court's determination ... but the court has an independent obligation to determine the appropriate punishment.") (internal quotation marks and citations omitted).