[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-14781

_____

JEAN-DANIEL PERKINS,

Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

Respondent- Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-04545-AT

_____

Before BRANCH and GRANT, Circuit Judges, and SCHLESINGER,[*] District Judge.

BRANCH, Circuit Judge:

After perpetrating elaborate bank and credit card fraud, Petitioner Jean-Daniel Perkins "embarked upon a new scheme . . . to ensnarl the proceedings against him" through obstructionist and disruptive behaviors "so that he might avoid trial altogether." *United States v. Perkins*, 787 F.3d 1329, 1333 (11th Cir. 2015). His scheme, however, did not end at trial or even when the jury issued its guilty verdict. Rather, it continued through sentencing. Now, on a motion to vacate his sentence pursuant to 28 U.S.C. § 2255, Perkins advances two claims: a substantive competency due process claim, contending that he was not competent at the time of sentencing, and an ineffective-assistance-of-counsel claim. The district court denied his § 2255 motion. After careful review and with the benefit of oral argument, we affirm.

## I.    Factual Background

In June 2010, a federal grand jury indicted Perkins on two counts of conspiracy to commit bank fraud, thirty counts of bank fraud, four counts of access device fraud, and one count of aggravated identity theft. These charges relate to three highly complex banking and credit card fraud schemes perpetrated by Perkins and various co-defendants.

---

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

During Perkins's initial appearance, a magistrate judge appointed counsel to represent Perkins. After Perkins pleaded not guilty to all counts, his counsel moved to withdraw because he and Perkins had "reached a point where they [were] unable to work together on the case." Counsel stated that Perkins "informed [him] that [Perkins was] not satisfied with [counsel's] representation and wishe[d] for him to withdraw from the case." The magistrate judge allowed counsel to withdraw and appointed a second attorney to represent Perkins. Despite being represented by counsel, Perkins filed various *pro se* filings, which the magistrate judge struck as irrelevant and improper.[1]

Perkins's second attorney also moved to withdraw, representing that Perkins did not want court-appointed counsel. The magistrate judge held a hearing and, after asking if Perkins wished to waive his right to counsel (to which Perkins gave a nonresponsive answer), the magistrate judge denied the motion.

Counsel later filed a second motion to withdraw, attaching an affidavit from Perkins stating that he did not want the attorney to represent him. The district court took up the motion during the pretrial conference. The district court denied the motion and determined that Perkins's refusal to acknowledge the court and his attempts to dominate the proceeding by talking over the court were "obviously designed to disrupt and obstruct the federal

---

[1] The district court later referred to these filings (and Perkins's behavior generally) as "sovereign citizenship on steroids."

proceeding." While characterizing Perkins's behavior as "crazy like a fox," the district court concluded that Perkins's actions were "definitely studied, definitely contrived, definitely manipulative. So [there was no] reason to send [Perkins] off for a competency examination." The district court stated that

> the situation we have here [is] a person who essentially his whole posture is simply to obstruct. He will not follow the court's directives. He believes the court has no power on him. When I ask[] a very simple question, he speaks in gibberish over and over and over again.

### 1. Trial

Perkins's trial began in June 2011. On the first day of trial, Perkins refused to leave his holding cell in the courthouse and told the marshals that if they forced him to go to the courtroom, he would go "kicking and screaming." The district court considered a variety of resolutions, including forcing Perkins to exit the cell and using audio/visual equipment to allow Perkins to observe the trial. Ultimately, the district court met with Perkins in an interview room, accompanied by counsel for the parties and a court reporter, and attempted to advise Perkins of his rights with respect to trial, but he shouted that he did not understand, agree, or consent to being present at trial. The district court provided audio/visual coverage to Perkins during the first day of trial and gave him the opportunity to enter the courtroom at any time and to speak with counsel.

On the second day of trial, Perkins again refused to be present in the courtroom. The district court observed that Perkins's antics were common to those espousing sovereign citizen beliefs and stated that it thought Perkins was not unstable but purely manipulative. The district court stated that it did not see a need for a competency hearing because Perkins was using a calculated strategy to disrupt and obstruct. Perkins refused to be present in the courtroom for the remainder of the trial, requiring restraints and marshal transport to the courthouse on day three. On June 28, 2011, the jury found Perkins guilty on all counts.

2. *Sentencing*

Between trial and sentencing, 19 months elapsed. Perkins's sentencing hearing took place on February 25, 2013. The presentence investigation report ("PSI") prepared in advance of sentencing calculated a guidelines range of life imprisonment, with a mandatory two-year term of imprisonment for Count 37 (aggravated identity theft) to run consecutive to any other sentence.[2] Neither Perkins nor any member of his family agreed to be interviewed for the PSI. The probation office therefore prepared the PSI using information from Perkins's presentence

---

[2] The PSI calculated a total offense level of 45 and a criminal history category of IV. Counts 1–32 carried 30 years' imprisonment, Counts 33–34 carried 10 years, and Counts 35–36 carried 15 years, followed by Count 37's mandatory term of 2 years' imprisonment.

report in his prior federal prosecution.[3]  That report, prepared in August 2000, included information about Perkins's prior diagnosis of schizoaffective disorder and medications he was prescribed for that disorder.

The PSI recounted a series of phone calls Perkins made in June 2011 to his mother and others while imprisoned during the proceedings below.  Of note, during these phone calls, Perkins:

- Requested research on how to stop his trial from proceeding;

- Indicated his belief that, if he acted crazy, he would not be considered "present" for his trial;[4]

- Discussed the legal definition of presence under the Federal Rules of Civil Procedure and case law; and

---

[3] In June 2000, Perkins was found guilty after a jury trial of conspiracy to produce false identification documents in the Eastern District of Louisiana.

[4] Perkins told his mother:

> I get it, I gotta go nuts before they even pick the jury, that's what I gotta do.  I gotta go haywire in that bitch.  Don't never act sensible.  Just go crazy.  Just keep on going crazy.  You bitches wanna play games, alright, this shit's gonna get really zoo-like.

He also stated: "If I'm there acting like a fucking lunatic, then I ain't there, my mind ain't there."  Further, he told his mother that he would not enter the courtroom to hear the verdict: "I don't want to be there for the verdict.  I'm gonna go down there crazy as a motherfucker . . . I'm tryin' every motherfuckin' thing.  I got 'em."

- Bragged that he had refused to enter the courtroom and was uncooperative with the district court.

Perkins refused to attend his February 2013 sentencing hearing. Again, the district court, counsel, and a court reporter visited Perkins in his holding cell. The district court attempted to give Perkins a copy of the PSI and then left the cell. During the hearing, Perkins's counsel presented mitigation evidence to the court, including that Perkins had been previously diagnosed with schizoaffective disorder, that he had been arrested 20 times before the age of 14, and that he was raised in foster care. Counsel requested mental health treatment for Perkins as part of his sentence and a downward variance to 12 to 15 years' total imprisonment. The district court announced a provisional sentence of 360 months' imprisonment but kept the record open to allow Perkins several weeks to review the PSI and make any objections.

After the sentencing hearing but before the entry of the sentence, Perkins's counsel filed a motion for a competency hearing. He stated that, despite having no recent contact with Perkins, he received information from another client regarding Perkins's mental state: "[A]nother client, who I believe has no interest in Mr. Perkins, inquired about my representation of him (Perkins). He noted that Perkins 'seemed crazy.'" Counsel also stated that he was contacted by an acquaintance who grew up in the foster care system with Perkins who believed Perkins had mental health issues. This individual visited Perkins in prison and

learned that he was taking antipsychotic and antidepressant medications.   Perkins told his visitor that he believed the government and his attorney were conspiring to kill him and that someone was tampering with his food.  Based on that information and the PSI's note regarding Perkins's schizoaffective disorder diagnosis in 2000, counsel requested a competency hearing.

The district court entered a lengthy order denying the motion (among others).  The district court noted that Perkins's actions were part of a "sovereign citizenship litigation strategy" designed to "delay the proceedings, create unnecessary work for the [c]ourt and counsel, and distract the [c]ourt from adjudication of the case on its merits."  The district court concluded that the jailhouse telephone calls showed that Perkins's refusal to cooperate was a "premeditated litigation strategy to insulate himself from a conviction."  Thus, it found that there "was certainly no question that [he] was competent at the time of his trial."  The district court also said that "his *pro se* motions prior to sentencing" and after trial "suggest that this level of competency remained."  With respect to sentencing, the district court stated that if Perkins was able to "establish a stronger foundation for questioning his competency at sentencing," and if he "was truly not competent at the time of sentencing, . . . it [would] be easy enough to resentence him once that is established."

Perkins's sentence was finalized in July 2013.  Following the entry of final judgment, Perkins appealed.  On direct appeal, represented by new counsel, Perkins argued, among other things,

that the district court erred in denying his motion for a competency hearing. *Perkins*, 787 F.3d at 1340. We affirmed his sentence and concluded that the district court did not abuse its discretion in finding Perkins competent to stand trial or in denying the motion for a competency hearing. *Id.* at 1339–40. We also held that the record supported the district court's conclusion that Perkins "seemed lucid." *Id.* at 1340.

### 3. *The present § 2255 motion and evidentiary hearing*

Perkins filed a motion to vacate pursuant to 28 U.S.C. § 2255 on December 7, 2016, raising five claims, only two of which are relevant on appeal: (1) substantive and procedural competency ("Claim One"); and (2) ineffective assistance of counsel related to counsel's failure to request a mental health evaluation ("Claim Two").[5]

To start, the government opposed the motion and asserted that the issue of a competency hearing was procedurally barred, Perkins was competent and thus was not prejudiced by allegedly deficient representation, and his attorneys' performance was not deficient. In his reply, Perkins argued that his "counsels' failure to

---

[5] In addition to the two claims we address today, Perkins raised three additional claims in his § 2255 motion: (3) a Sixth Amendment violation relating to the district court's meeting with Perkins in the Marshals' lockup prior to the start of trial; (4) ineffective assistance of counsel relating to counsel's failure to object to the meeting with the district court prior to the start of trial; and (5) ineffective assistance of counsel for failure to move for a recusal of the district court judge. He does not raise these issues on appeal.

request relevant medical records is one component of their failure to properly make and support a request for a competency hearing," but also requested leave to amend his motion to add a claim based on his counsels' failure to request Perkins's medical records if the district court disagreed with that argument.[6]

The magistrate judge held an evidentiary hearing on one issue: whether Perkins's attorneys provided ineffective assistance in failing to request a mental health evaluation prior to or during trial or after trial and before sentencing.

The magistrate judge heard testimony from several witnesses, including three medical professionals from the Bureau of Prisons ("BOP") who treated Perkins. Dr. Nancy Strauch, a BOP psychiatrist, treated Perkins once in March 2010, at which time she diagnosed him with substance-induced delusional disorder, meaning that Perkins's "paranoia . . . could be due to substance misuse or abuse or dependence." On direct examination, she testified that Perkins did not mention to her that he was mentally ill and that she believed medication was not necessary. On cross-examination, Dr. Strauch testified that she never performed a

---

[6] While the district court did not specifically reference Perkins's motion to amend his § 2255 petition, the magistrate judge acknowledged it in its report and recommendation and found that such an "argument exceed[ed] the scope of the claim delimited for the evidentiary hearing and . . . amount[ed] to nothing more than speculation built upon speculation." The district court then adopted the report and recommendation as the order and opinion of the court.

20-14781                Opinion of the Court                11

competency evaluation of Perkins because it was not her job to do so.

Dr. Amanda Eberle, a BOP psychologist, treated Perkins from November 2013 to March 2017 and diagnosed him with schizophrenia[7] in 2014, placing him on various medications. While she testified that she believed Perkins had delusional thoughts, she did not offer any opinion as to Perkins's competency because it was not her job to do so. However, she also clarified on cross-examination that the symptoms of delusions she reported were based upon Perkins's self-reporting. Counsel for the government noted that Dr. Eberle did not document any delusions whatsoever between September 2014 and September 2016.

Dr. Courtney Tibbetts, a BOP psychologist, treated Perkins in 2017. She testified that Perkins's symptoms were inconsistent and largely self-reported and that she believed his symptoms were calculated.[8] She testified that she did not believe Perkins had

---

[7] Dr. Eberle explained the difference between schizophrenia and schizoaffective disorder:

> Schizoaffective disorder is basically a combination of schizophrenia and a mood disorder. With Mr. Perkins I saw symptoms of schizophrenia with the delusional belief, but I did not see any evidence that any of that was tied to any kind of mood disorder.

[8] Dr. Tibbetts testified that Perkins's self-reporting of symptoms typically occurred in close temporal proximity to "goal-oriented behavior," *i.e.*, when he wanted something.

schizophrenia because carrying out the "rather intricate" fraud with which he was convicted would not be typical for someone with schizophrenia.

The magistrate judge also heard testimony from both of Perkins's appointed counsel. Perkins's first attorney testified that he received the 2000 PSI in June 2010, which included Perkins's prior schizoaffective disorder diagnosis, but that he had no concerns about Perkins's mental health because Perkins appeared competent. He stated that Perkins never showed any signs of delusions or that he was out of touch with reality but rather that he understood the charges against him, possible defenses, and how the criminal justice system functioned. Perkins's second attorney, who represented him at trial and sentencing, testified that Perkins raised a sovereign citizen defense. He testified that he did not discuss any mental health issues with Perkins and did not request medical records but believed he should have done so after receiving the 2000 PSI and talking to a relative about Perkins's mental health issues. He noted, however, that prior to receiving the PSI and speaking with Perkins's relative, he had no concerns about Perkins's competency.

Lastly, the magistrate judge heard testimony from two expert witnesses. Dr. Adriana Flores, a clinical psychologist and expert witness offered by Perkins, and Dr. Michael Vitacco, a forensic psychologist and expert witness offered by the government. Dr. Flores evaluated Perkins in 2019 and, based on the evaluation, review of medical records, and the record in the

case, concluded that Perkins was not competent at the time of his 2011 trial or 2013 sentencing. She testified that Perkins displayed delusional, paranoid, and disjointed thoughts and that she believed Perkins could not understand the consequences of the criminal proceedings as a result.

Dr. Vitacco, on the other hand, did not evaluate Perkins but reviewed his medical records, legal documents, and the jailhouse phone calls and concluded that Perkins was competent at the time of his trial and sentencing. He testified that Dr. Flores's conclusions ran counter to Perkins's psychiatric history and that he agreed with Dr. Tibbetts that Perkins's behaviors and symptoms were calculated.

Perkins also submitted his psychological records, one of which contained information relating to a diagnosis of depressive type psychosis he received from Dr. Victor Gonzalez[9] at the BOP on December 17, 2012, while Perkins awaited sentencing. Perkins points to three additional purportedly relevant notations or diagnoses in these medical records: (1) a psychology services intake screening related to a prior case that occurred on October 23, 2001, notes of which showed Perkins's prior prescriptions of Vistaril,

---

[9] Perkins relies heavily on a single record of his evaluation by Dr. Gonzalez, but the record does not reveal much about Dr. Gonzalez himself or his evaluation of Perkins other than that Dr. Gonzalez diagnosed Perkins with depressive type psychosis at the United States Penitentiary in Atlanta, Georgia.

Effexor, and Risperdal;[10] (2) a March 12, 2010, psychological evaluation at the Robert A. Deyton Detention Center, during which Perkins exhibited a "flight of ideas" and signs of paranoia about the AIDS virus; and (3) Dr. Strauch's March 17, 2010, psychiatric evaluation, when she observed Perkins exhibiting paranoid ideations she associated with substance abuse.

Following the hearing and supplemental briefing, the magistrate judge issued a report and recommendation recommending that the district court deny Perkins's § 2255 motion and deny a certificate of appealability ("COA"). Regarding Claim One (substantive and procedural competency), the magistrate judge concluded that Perkins was procedurally barred from raising the claim on collateral review because we denied it on direct appeal. The magistrate judge also concluded Perkins was competent at the time of trial and at sentencing. As for Claim Two (ineffective assistance of counsel), the magistrate judge determined

---

[10] Vistaril, or hydroxyzine, is prescribed to treat anxiety and tension. *See Hydroxyzine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/proper-use/drg-20311434?p=1, (last updated June 1, 2023). Effexor, or venlafaxine, is an anti-depressant used to treat general anxiety disorder, social anxiety disorder, and panic disorder. *See Venlafaxine (Oral Route) Description and Brand Names*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379, (last updated June 1, 2023). Risperdal, or risperidone, is an anti-psychotic prescribed to treat schizophrenia, bipolar disorder, or irritability associated with autism. *See Risperidone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drg-20067189?p=1, (last updated June 1, 2023).

20-14781               Opinion of the Court               15

that Perkins had not demonstrated that his counsel was deficient before or during trial, as well as before sentencing, because any competency motion likely would have been futile. The magistrate judge, expressly discounting Dr. Flores's testimony as not credible and unreliable, determined that Perkins did not demonstrate that he suffered prejudice because he had not established that he was incompetent at trial or at sentencing.[11]

Perkins filed objections to the magistrate judge's recommendation that Claims One and Two be denied and that a COA be denied. Nonetheless, the district court adopted the report and recommendation. The district court stated that "[f]rom a review of the record it is clear that [Perkins], leading up to his trial, during his trial, and afterward, attempted to fake being mentally incompetent in an effort to disrupt his criminal proceedings." The district court also concluded that because we ruled on direct appeal that the district court had not erred in denying Perkins's motion for a competency hearing, we implicitly found that there was no bona

---

[11] Specifically, the magistrate judge stated:

> [A]lthough Dr. Flores opined that [Perkins] was not competent at trial or sentencing, the undersigned finds that Dr. Flores's testimony is entitled to little, if any, weight. Dr. Flores primarily based her opinion on her personal observations of [Perkins], yet it is difficult to see how such present observations, conducted in late 2019, could reveal whether [Perkins] was competent in 2011, over eight years beforehand. Dr. Flores's conclusion . . . is also at odds with the observations of numerous other doctors.

fide doubt as to Perkins's competency. As for Claim Two, the district court agreed that Perkins had not proven prejudice for his ineffective-assistance-of-counsel claim because the trial and sentencing court would not have granted a motion for a competency hearing and Perkins had not established that he was incompetent.

Although the district court adopted the report and recommendation and denied Perkins's § 2255 motion, it granted a COA on one issue, noting "the long time gap between the trial and the sentencing hearing (roughly 19 months) and the fact that [Perkins] has presented significant evidence that his mental health legitimately appeared to deteriorate in the interim."

Perkins timely appealed the denial of his § 2255 motion. He also filed a motion to expand the COA, which we denied in part and granted in part. There are now two issues on appeal:

1) "Whether Mr. Perkins's substantive due process rights were violated when he was denied a competency hearing in connection with his sentencing hearing because of the long[]time gap between the trial and sentencing and because he had presented evidence that his mental health legitimately appeared to have deteriorated over that time period;" and

2) "Whether trial counsel provided ineffective assistance by failing to seek a mental-health evaluation or request Mr. Perkins's mental-health records when

trial counsel learned, after trial but before sentencing, that Mr. Perkins suffered from mental-health issues."

## II.    Discussion

In reviewing a district court's denial of a motion to vacate under 28 U.S.C. § 2255,[12] we review legal conclusions *de novo* and findings of fact for clear error. *Stoufflet v. United States*, 757 F.3d 1236, 1239 (11th Cir. 2014).

### A.  *Perkins's substantive competency claim (Claim One)*

We turn first to the merits of Perkins's substantive competency during sentencing claim.[13]  The Due Process Clause

---

[12] Under § 2255, a prisoner in federal custody may file a motion to vacate, set aside, or correct a sentence when he claims

> the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a).

[13] The government argues that Perkins is procedurally barred from raising both of his claims because, according to the government, we held on direct appeal that Perkins was competent at the time of trial and sentencing.  We may decline to consider whether an issue is procedurally barred where it will ultimately fail on the merits.  *See, e.g.*, *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) ("When relief is due to be denied even if claims are not procedurally barred, we can skip over the procedural bar issues[.]").  Even assuming that Perkins is not procedurally barred from raising either of his claims, they would fail on the merits, as we discuss below.  We therefore

of the Fifth Amendment prohibits the government from trying a defendant who is incompetent.  *See* U.S. Const. amend. V; *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  This right extends to sentencing. *See United States v. Rahim*, 431 F.3d 753, 759–60 (11th Cir. 2005).

A petitioner "is entitled to no presumption of incompetency and must demonstrate his . . . incompetency by a preponderance of the evidence." *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 481 (11th Cir. 2012) (quoting *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992)).  "[T]he standard of proof is high," and the facts must "positively, unequivocally and clearly generate [a] legitimate doubt."  *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992) (quotation omitted).  The determination of competence asks "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him."  *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

"Not every manifestation of mental illness demonstrates" that the defendant is incompetent; "rather, the evidence must indicate a present inability to assist counsel or understand the charges" at the time of the relevant proceeding, such as trial or sentencing.  *Battle v. United States*, 419 F.3d 1292, 1299–1300 (11th

decline to address whether Perkins is procedurally barred from raising either his substantive competency claim or his ineffective-assistance-of-counsel claim.

Cir. 2005) (distinguishing the defendant's behavior in the courtroom at trial with his purported "history of mental illness"). Likewise, neither low intelligence nor mental deficiency can be equated with mental incompetence. *Id.*; *see also Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1259 (11th Cir. 2002). The fact that a petitioner was prescribed psychiatric drugs, standing alone, does not raise a bona fide doubt as to his competence to stand trial. *See Pardo v. Sec'y, Fl. Dep't of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009) ("Absent evidence of such an inability [to assist counsel or understand the charges], evidence of low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of anti-psychotic drugs is not sufficient to show incompetence to stand trial.").

Whether a petitioner is substantively competent is a factual determination. *United States v. Izquierdo*, 448 F.3d 1269, 1278 (11th Cir. 2006). Thus, we review a district court's competency determination for clear error. *United States v. Bradley*, 644 F.3d 1213, 1267 (11th Cir. 2011). Clear error review, which is "highly deferential," asks whether a factual finding, supported by evidence, leaves us "with the definite and firm conviction that a mistake has been committed." *Eggers v. Alabama*, 876 F.3d 1086, 1094 (11th Cir. 2017). Faced with conflicting expert testimony, a district court does not clearly err by crediting one opinion over another where other record evidence also supports the conclusion. *Battle*, 419 F.3d at 1299; *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly

erroneous."). "[A]n appellate court . . . must afford 'due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses.'" *Eggers*, 876 F.3d at 1095 (quoting *Amadeo v. Zant*, 486 U.S. 214, 223 (1988)).

The magistrate judge and district court did not clearly err, in ruling on Perkins's § 2255 motion, in choosing not to credit the expert testimony of Dr. Flores and determining that Perkins was competent at the time of sentencing. The magistrate judge primarily relied on (1) Perkins's June 2011 jailhouse phone calls demonstrating his knowledge of criminal procedure and the court proceedings; and (2) the expert testimony presented at the evidentiary hearing. The district court, in adopting the report and recommendation of the magistrate judge, stated that "[h]aving . . . reviewed the record," it agreed that Perkins was competent at the time of trial and sentencing and that it would not disturb the magistrate judge's credibility determinations as to Dr. Flores.

Based on the evidence in the record and the testimony presented at the § 2255 evidentiary hearing, there is no indication, much less one that would lead to a "definite and firm conviction" on appeal, that the district court's conclusion that Perkins was competent during sentencing was wrong.

First, Perkins's 2011 phone calls to his mother are strong evidence that Perkins's bizarre behavior throughout trial and during the sentencing phase was a contrived and intentional attempt to disrupt the district court's proceedings. Of course, the 19-month gap between the time of these phone calls and his 2013

sentencing is not insignificant. But, importantly, the phone calls are evidence that immediately prior to trial, Perkins intentionally feigned mental illness in an attempt to avoid and thwart the proceedings against him. Accordingly, the magistrate judge did not clearly err in affording some weight to these phone calls when determining that Perkins was competent at the time of sentencing.

Second, the magistrate judge did not clearly err when it afforded "little, if any, weight" to the testimony of Dr. Flores as a result of (1) the long period between her evaluation and the relevant time period in this case and (2) the fact that her testimony conflicted with the other experts' testimonies.

Dr. Flores evaluated Perkins on September 5 and 26, 2019—more than eight years after his trial and more than six years after sentencing. This time gap notwithstanding, based upon her evaluation of Perkins and review of various record materials, she determined that Perkins was not competent in June 2011 at the time of trial, nor was he competent in February 2013 at the time of sentencing. However, Dr. Flores's report is based almost exclusively on Perkins's own recollections of his prior mental state.[14] These observations may touch on Perkins's understanding

---

[14] For instance, she wrote: "About sentencing, [Perkins] said, he 'Had not talked to anyone about nothing. [He] wasn't really into it. [He] didn't care' (he indicated that he was on Risperdal and Prozac at the time)." She also recounted that "Mr. Perkins said, 'I didn't give a shit about nothin'. I knew what this dude [his attorney] was up to. I knew he was out to get me. But, for the most part, I didn't care about anything.'"

of his mental state at the time of sentencing, but they are not specific or probative enough to disturb the district court's competency finding because information provided by Perkins in late 2019 does very little to shed light on his mental state in 2013. Furthermore, at the evidentiary hearing, Dr. Flores could not provide any additional explanation as to how she concluded, based upon her 2019 evaluation, that Perkins was incompetent *at the time of sentencing*. For instance, she conceded that there was no record of Perkins experiencing hallucinations at the time of trial or sentencing.[15] She also admitted that it was difficult to assess

---

[15] Dr. Flores testified as follows:

> Q [by the government]. And . . . your observing hallucinations are part of your bases for the conclusion that [Perkins was] incompetent?
>
> A [by Dr. Flores]. I'm saying that those symptoms are consistent with a severe and persistent thought disorder that existed at the time of trial and sentencing.
>
> Q. Okay. But there's no evidence of him ever experiencing these hallucinations at the time of this trial, right?
>
> A. No, there's – there's nothing that points to that, that's correct.
>
> Q. Or even after his trial before you saw him?
>
> A. There's mention – there's mention in the record multiple times he has reported experiencing hallucinations in the past.
>
>                              ★ ★ ★

Perkins's competency retrospectively. Accordingly, Dr. Flores's own report and testimony undermine her conclusion that Perkins was incompetent, and the magistrate judge and the district court did not clearly err in concluding that Dr. Flores's severely post-dated competency determination was not credible.

Additionally, the magistrate judge and the district court did not clearly err in choosing not to credit Dr. Flores's opinion in light of its conflict with those given by the other doctors who examined Perkins post-sentencing, but prior to Dr. Flores. For example, the magistrate judge noted that while Dr. Flores observed Perkins displaying signs of psychosis immediately upon meeting her, Dr. Eberle did not report any psychotic symptoms between September 2014 and September 2016 and Dr. Tibbetts did not report any psychotic problems between May and December 2017 while treating Perkins regularly. In the magistrate judge's view, it was simply not credible that Perkins's symptoms reappeared "precisely at an important evaluation for his motion to vacate," especially considering that Dr. Tibbett had observed that Perkins's symptoms tended to be goal oriented. The district court agreed, noting that it was "clear" that Perkins maintained "his efforts to 'game' the

---

Q. And is it your conclusion in this case that he was experiencing hallucinations at the time of his trial and sentencing?

A. There's some indication that he may have been, *but I don't have anything in the record, that's completely a self-report.*

(emphasis added).

system to his advantage." Our review of the record reveals that neither the magistrate judge nor the district court clearly erred in declining to credit Dr. Flores's opinion.

Perkins has not demonstrated that the magistrate judge, and subsequently the district court, clearly erred in choosing to discredit Dr. Flores's report and testimony, given that Dr. Flores's opinions were based upon primarily Perkins's own self-reporting six years after his sentencing and her opinions conflicted with the opinions of other doctors who had evaluated Perkins prior to 2019. We are not left with a "definite and firm conviction" that a mistake was made by the district court in denying Claim One of Perkins's § 2255 petition. We therefore affirm the district court's denial of Perkins's substantive competency claim.

### B. *Perkins's ineffective assistance of counsel claim (Claim Two)*

Perkins has alleged that he received ineffective assistance of counsel because of his "counsel's failure to secure relevant records, investigate [his] mental health issues, or attempt to secure a mental health evaluation or a competency evaluation."[16]

---

[16] While Perkins raised this argument below, the magistrate judge focused on counsel's decision not to move for *a competency hearing* prior to trial, concluding that the trial and sentencing court would not have granted such a motion based on its statements indicating that it thought that "in no uncertain terms . . . [Perkins] was competent." The district court, likewise, agreed with the magistrate judge that Perkins had not established deficient performance or prejudice because it likely would not have granted a motion for a competency hearing and Perkins had not established that he was incompetent. Neither the

20-14781                Opinion of the Court                25

"In a 28 U.S.C. § 2255 proceeding, we review a district court's legal conclusions *de novo* and factual findings for clear error." *Devine v. United States*, 520 F.3d 1286, 1287 (11th Cir. 2008). Whether counsel was ineffective is a mixed question of law and fact that we review *de novo*. *Id.* A defendant is entitled to the effective assistance of counsel not only during the guilt or innocence phase of a criminal trial, but also during sentencing, resentencing, and on direct appeal. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim for ineffective assistance of counsel, a petitioner must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*) (quoting *Strickland*, 466 U.S. at 689).

Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In assessing attorney performance, the reviewing court should make every effort "to eliminate the distorting effects

---

magistrate judge nor the district court addressed Perkins's claim that, had his counsel sought medical records or requested a mental health or competency evaluation, counsel could have used such evidence in support of mitigation during sentencing. But, as we explain below, counsel's performance was not deficient, and Perkins has not established that he was prejudiced by his counsel's allegedly deficient performance as related to his medical records or potential mental health or competency evaluations.

of hindsight" and "evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

There is a "'strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler*, 218 F.3d at 1314 (quoting *Strickland*, 466 U.S. at 689). For this reason, in order for a petitioner "to show that [counsel's] conduct was unreasonable, [he] must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1315. This is "a difficult burden." *Johnston v. Singletary*, 162 F.3d 630, 634 (11th Cir. 1998).

Prejudice occurs when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. Rather, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687).

"[U]nder certain circumstances, trial counsel's failure to apprise the court of a client's changing mental state . . . can constitute ineffective assistance." *Johnston*, 162 F.3d at 635 (emphasis in original). To establish deficient performance in this context, a defendant must show that his counsel failed to bring

"information raising a bona fide doubt regarding [his] competency" to the trial court's attention when every reasonable attorney would have done so. *James*, 957 F.2d at 1570. Further, to establish prejudice, he must show that "there was a reasonable probability that he would have received a competency hearing *and* been found incompetent had counsel requested the hearing." *Lawrence*, 700 F.3d at 479 (emphasis in original).

We have held that where counsel fails to conduct a "thorough investigation of law and facts," his performance can be ineffective. *Sullivan v. Sec'y, Fla. Dep't of Corr.*, 837 F.3d 1195, 1204 (11th Cir. 2016). However, "[c]ounsel's investigation does not fall below *Strickland*'s standard so long as a reasonable lawyer could have decided, under the circumstances, not to investigate particular evidence." *Id.* at 1204–05 (quotation omitted and alteration adopted). Furthermore, a petitioner must be able to point to evidence of prejudice that amounts to more than mere speculation. *See Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("[S]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

### 1. Deficient Performance

Perkins's second attorney, who represented him at trial and sentencing, testified during the evidentiary hearing that he did not request medical records or a mental health evaluation even though he "probably should have" and that "there was no good reason not

to" request an evaluation.[17]   However, he also stated that he did not request the records or evaluation because he did not learn of Perkins's mental health issues until he received the PSI and did not have any reason to believe that Perkins was incompetent.   He recalled that Perkins had not cooperated with him prior to trial and thus he had no meaningful opportunity to learn anything from Perkins, including any information about his mental health.[18]

After he received the PSI and learned of Perkins's mental health issues, counsel spoke with Perkins's mother about Perkins's mental health history.  At sentencing, counsel informed the district court that Perkins had a history of schizoaffective disorder and that there was "something wrong" with Perkins.   Counsel also requested mental health treatment for Perkins.  He testified that after issuance of the district court's provisional sentence of 360 months' imprisonment, he realized he "had not done something right" and that he wanted Perkins's competency evaluated.  It was then that he filed his motion for a competency hearing.[19]

---

[17] Perkins's first attorney testified at the evidentiary hearing that he did not have any concerns about Perkins's mental health or competency.

[18] From the start of his representation of Perkins through trial, Perkins's second attorney was under the impression that Perkins ascribed to the beliefs of the sovereign citizen movement.  And in his testimony, counsel never attributed any of Perkins's sovereign citizen beliefs or bizarre behavior, such as refusing to attend his trial, to mental illness or mental incompetence.

[19] By this time, counsel had also learned through another client incarcerated with Perkins that Perkins "seemed crazy."

According to Perkins, however, his attorney should have requested Perkins's medical records and moved for a mental health evaluation upon learning about Perkins's mental health issues from the PSI before sentencing. Perkins contends that if counsel had obtained Perkins's medical records and an evaluation, that additional evidence could have been used as mitigation at the sentencing hearing or bolstered the motion for a competency hearing after sentencing. He argues that the medical records, if counsel had requested and reviewed them, would have shown "a history of mental health issues that would have warranted further investigation at the time of sentencing." Specifically, Perkins relies on the December 2012 diagnosis of depressive type psychosis by Dr. Gonzalez while Perkins was incarcerated in Atlanta.

But Perkins ignores that counsel did, in fact, request that the district court order mental health treatment as part of any sentence imposed. Counsel also moved for a competency hearing following sentencing so "a record regarding Mr. Perkins['s] mental status could be developed"—all this without being equipped with the additional medical records from the BOP.

Perkins's counsel's performance was not deficient. After learning of Perkins's mental health issues from the PSI, he spoke with Perkins's mother, raised his concerns about Perkins's mental state to the district court during the sentencing hearing, and continued to keep the district court apprised of a suspected change in Perkins's mental state by moving for a competency hearing after the sentencing hearing. Any failure to strengthen the motion for a

competency hearing or the mitigation evidence presented at sentencing does not render counsel's performance unreasonable under *Strickland*. *See Harrington*, 562 U.S. at 110 ("*Strickland* does not guarantee perfect representation[.]"); *Johnston*, 162 F.3d at 635; *James*, 957 F.2d at 1570.

### 2. Prejudice

Even assuming these alleged failures constitute deficient performance, Perkins has not established prejudice. He has not shown that there was a reasonable probability that he would have received a more lenient sentence as a result of any mitigating evidence contained in his medical records beyond what counsel presented at sentencing or that would have been uncovered during a mental health evaluation.

First, there are no documents in the medical or BOP records upon which Perkins relies demonstrating or even mentioning his competence, *i.e.*, his ability to understand the proceedings or to assist counsel in his defense. For instance, Perkins's December 2012 diagnosis of depressive type psychosis from Dr. Gonzalez is contained only in a one-line entry in a single medical record. The record contains no notes, discussion, or elaboration on the diagnosis. While a diagnosis of depressive type psychosis might suggest that Perkins was suffering from a mental illness that *could have* impaired his competency, Perkins has pointed to no evidence that this illness did, in fact, render him incompetent at the time of sentencing. Similarly, Perkins points to information from Dr. Strauch's evaluation in 2010 contained in his medical records. That

information shows that Perkins was taking various psychiatric drugs and was exhibiting certain paranoid behaviors but, importantly, those documents do not contain any information or opinion from Dr. Strauch as to Perkins's competency. The lack of any competency determination from Dr. Strauch is not surprising, given that Dr. Strauch testified at the evidentiary hearing that she did not provide any opinion as to Perkins's competency because it was not her job to do so.[20] Because those records do not contain any indication that any of Perkins's several providers found him not to be competent, he has not demonstrated that bringing those records to the court's attention before the imposition of his sentence would have given the district court a bona fide doubt as to his competency. *See James*, 957 F.2d at 1570.

Second, Perkins again relies upon Dr. Flores's testimony during the evidentiary hearing about her 2019 evaluation of Perkins, arguing that, had a similar evaluation been conducted sooner, the results of that earlier evaluation could have been used as mitigation evidence at sentencing. Again, Perkins points to no indication in his medical records or from the evidentiary hearing that any evaluation conducted at the time of his 2013 sentencing

---

[20] Perkins also points to a May 2014 diagnosis of schizophrenia from a BOP physician, which he argues demonstrates that Perkins "actually had a diagnosable mental illness close in time to sentencing." It should go without saying that Perkins could not have been prejudiced by counsel's failure to request medical documents that post-date his sentencing by over 14 months.

would have resulted in a diagnosis that would have given the district court a bona fide doubt as to his competency. *See id.*

Indeed, the district court noted on numerous occasions before, during, and after trial, as well as during and after sentencing, that Perkins exhibited obstructionist behavior that was "studied, definitely contrived, definitely manipulative," and appeared to be "sovereign citizenship on steroids," designed to be "dramatic" and "provocative." The district court also indicated that it was possible that Perkins's post-trial statements made to the acquaintance who visited Perkins in prison could have been "a further effort to manipulate the court system," and that his post-trial *pro se* motions indicated that Perkins remained competent. With such a definitive impression of Perkins as a competent, deliberate obstructionist, it is highly unlikely that the district court would have changed its mind about Perkins's competency if it were presented with an additional diagnosis of mental illness at the time of sentencing, given Perkins's prior transparent attempts to game the system. In short, Perkins has failed to establish a reasonable probability that he would have received a mental health evaluation before or after the sentencing hearing had counsel requested Perkins's medical records and that he would have been found incompetent as a result. *Lawrence*, 700 F.3d at 479.

For these reasons, we affirm the district court's rejection of Perkins's claim for ineffective assistance of counsel.

### III.     Conclusion

Perkins's substantive due process rights were not violated when the district court denied his motion for a competency hearing.     Nor did Perkins receive constitutionally deficient performance from court-appointed counsel when they failed to request his medical records or request a mental health evaluation. Even if such failures constituted deficient performance, Perkins has not demonstrated that he was prejudiced as a result.     Thus, the district court did not err in denying Perkins's § 2255 motion and we affirm.

**AFFIRMED.**